CONDIT, appellant, and BLACKWELL, respondent.

1. Tax deeds in Wisconsin, which omit the words "as the fact is" in the given form, are void.

2. In a contract of purchase and sale between attorney and client, or principal and agent, the burden of establishing its perfect fairness, adequacy, and equity, is thrown upon the attorney or agent, and in the absence of such proof, courts of equity treat the case as one of constructive fraud. In case of trustee and *cestui que trust*, the contract may be avoided at the option of the *cestui que trust*.

3. The application of the rule which measures the duty of an agent, makes this a case of constructive fraud.

The opinion of the Chancellor is reported in 4 *C. E. Green* 194.

*Mr. W. S. Whitehead* and *Mr. McCarter,* for appellant.

The bill in this case is filed for the re-conveyance by the respondent to the appellant, of a house and lot in the town of Orange, New Jersey.

The property in question was conveyed by the appellant to the respondent, by deed dated June 16th, 1865, for the consideration of $6500, subject to a mortgage of $2500; said deed containing full covenants of warranty and seizin.

The only consideration for this conveyance was the conveyance by the respondent to the appellant, by deed of even date, of 2550 acres of land in the state of Wisconsin. The consideration named in the last mentioned deed was $100, and the deed contained only a covenant against the acts of the grantor and those claiming under him.

The appellant relies on the following general points:

1st. That the title to the lands which the respondent undertook to convey to the appellant, as the consideration for the appellant's conveyance, was void for two reasons:

1. That if respondent had ever had a good title to the lands, they had been sold for taxes, and the time allowed by the law of Wisconsin for their redemption had expired.

2. That the respondent never had title, and that deeds such as those under which he held, had been declared void by the Supreme Court of Wisconsin.

*Laws of Wisconsin, of* 1854, *p.* 78; *Rev. Stat. of Wisconsin, of* 1858, *p.* 233; *Laws of Wisconsin, of* 1859, *p.* 27; *Lain* v. *Cook,* 15 *Wis.* 446; *Lain* v. *Shepardson,* 18 *Wis.* 59; *Wakeley* v. *Mohr, Ibid.* 321.

2d. That the appellant was induced to make the conveyance of his land in Orange by reason of actual fraud on the part of the respondent, and misrepresentations made to appellant, and by respondent's taking advantage of the fiduciary relation which existed between them.

3d. That the respondent, being a lawyer by profession, at the time of the exchange of the lands in question in this cause, was, and for some time previous had been, acting as the counsel for the appellant in regard to other lands of appellant in the west, and in regard to the payment of taxes thereon, and was also, at the same time, employed as agent by the appellant for the sale of the lands of appellant in Orange, which were conveyed to respondent, and that appellant relied upon respondent as his counsel and agent in this transaction.

4th. That the exchange was constructively fraudulent, by reason of the fiduciary relation which the respondent held to the appellant, and was therefore void.

1 *Story's Eq. Juris.,* §§ 310, 312, 315–316 *a,* and cases cited; *Story on Agency,* §§ 210–212; *Poillon* v. *Martin,* 1 *Sandf. Ch.* 569; 2 *Sug. on Ven.* 887–889, and notes; *Paley on Principal and Agent,* 33, and note 4; *Parkist* v. *Alexander,* 1 *Johns. Ch.* 394; *Davoue* v. *Fanning,* 2 *Johns. Ch.* 252; *York Buildings Co.* v. *MacKenzie, cited in* 2 *Johns. Ch.* 268; *Torrey* v. *Bank of Orleans,* 9 *Paige* 663; *Banks* v. *Judah,* 8 *Conn.* 146; *Copeland* v. *Ins. Co.,* 6 *Pick.* 203, and note; *Jackson* v. *Van Dalfsin,* 5 *Johns. R.* 43; *Central Ins. Co.* v. *National Ins. Co.,* 14 *N. Y.* (4 *Kern.*) 85; *Utica Ins. Co.* v. *Toledo Ins. Co.,* 17 *Barb.* 134; *Reed* v. *Warner,* 5 *Paige* 656; *Ex parte Lacey,* 6 *Vesey* 629; *Ex parte Ben-*

*nett,* 10 *Vesey* 398; *Tate* v. *Williamson,* 1 *Eq. Cas.* 528; 2 *Ch. Ap. Cas.* 56; *Kennedy* v. *Brown,* 11 *Law Reg.* 357; *Scott* v. *Gamble,* 1 *Stockt.* 235; *Huston* v. *Cassedy,* 2 *Beas.* 228; *Mulford* v. *Bowen,* 1 *Stockt.* 797.

5th. That in such a case the burden of establishing the perfect fairness, adequacy of price, and equity of the transaction, is thrown upon the agent or attorney.

Same authorities cited on the fourth point.

*Mr. Blake* and *Mr. C. Parker,* for respondent.

No fraudulent representations are proved by any witness except Condit.

His story is not corroborated by facts or circumstances.

Many of his statements are disproved by the other witnesses; sometimes, by his own testimony.

The *probabilities* of the case are with Blackwell, not with Condit.

Condit is thus shown to be an *unreliable witness.* And it is unnecessary to suggest the old maxim.

Blackwell's story is not only consistent with itself, but is corroborated in several very important particulars.

Even were Condit's story to be accepted as true, *he has not introduced any legal evidence of a defective title* to the lands in controversy. On the contrary—by his own showing—the title is good to the principal part of the lands. And whether such title be good or bad, the testimony shows clearly that Condit has received all that he bargained for—that he took the property subject to all possible contingencies of failure of title.

A case of this character (involving the personal reputation of a party) may not be decided upon presumptions; but, strictly, according to law and the evidence.

Fraud is never to be presumed; it must be clearly proved by the party making the charge. The presumption of law is always against bad faith. *Stewart* v. *English,* 6 *Ind.* 176; *Flint* v. *Jones,* 5 *Wis.* 424; *Turner* v. *Lambeth,* 2 *Tex.* 365; *Hubbard* v. *Turner,* 2 *McLean* 519; *Gould* v. *Gould,* 3

---

Condit v. Blackwell.

---

*Story C. C. R.* 516; *Hildreth* v. *Sands,* 2 *Johns. Ch.* 35; 1 *Story's Eq. Jur.,* § 200; *Atwood* v. *Small,* 6 *Clark & Fin.* 232.

The opinion of the court was delivered by

VAN SYCKEL, J.

The object of the bill filed in this case is to set aside a deed for a house and lot, in Orange, made by Condit to Blackwell, and to compel a re-conveyance to Condit, on account of alleged fraud in the transaction. The consideration for said deed was the conveyance by Blackwell to Condit, of 2550 acres of land in Wisconsin, to which the former claimed to hold title under tax sales.

The deed executed by Condit bears date June 17th, 1865; the consideration specified in it is $6500, and it contains full covenants, subject to a mortgage of $2500. The deed for the Wisconsin lands bears the same date; the consideration named is $100, and the covenants are only against acts of the grantor and those claiming under him.

It is insisted, on the part of the appellant, that Blackwell, at the time he made said conveyance, had no title to the lands in Wisconsin; and he is charged with fraud, both constructive and actual, in effecting the exchange. Blackwell's title rested upon a deed made to him by Edward B. Howell (who held under tax deeds), October 1st, 1861, for a portion of said lands, and for the balance thereof upon a number of tax deeds, each bearing date January 14th, 1862.

The tax laws of the state of Wisconsin for the years 1854, 1858, and 1859, were in evidence, and were referred to by the counsel of the respective parties on the argument of the cause. By the act of 1854, the form of the deed is prescribed (ch. 66, § 3); the same form is retained by the act of 1858 (ch. 18, § 153), and re-enacted by the act of 1859 (ch. 22, § 50). In the tax deeds to Blackwell, the words "as the fact is," which occur in two places in the given form, are omitted. The Supreme Court of Wisconsin have held that this omission is fatal to the validity of a deed.

*Lain* v. *Cook*, 15 *Wis.* 446; *Lain* v. *Shepardson*, 18 *Wis.* 59; *Wakeley* v. *Mohr*, 18 *Ibid.* 321.

It also appears, by reference to these tax laws, that all these lands were subject to be sold, annually, for the non-payment of taxes subsequent to those for which they were sold to Howell and Blackwell; and unless redeemed within three years after such sale, the title of the subsequent purchaser would become absolute, provided his deed was recorded.

It is admitted that no taxes were paid on the 2550 acres after 1857, and that they were encumbered by taxes assessed after that date to the amount of several hundred dollars. Sworn copies, in evidence, of entries and records made in the books of the treasurer of the county of Vernon, show that, between 1857 and 1865, about 900 acres of said lands had been sold from Blackwell for non-payment of taxes, and that there are imperfections in the title to other 400 acres. These entries and records are required to be made by the said tax laws of 1858; and section 178, of chapter 18, which provides that they shall be *prima facie* evidence of the facts therein stated in all judicial proceedings in Wisconsin, entitles them to the same consideration in the courts of this state. The defects in the Blackwell title being thus established, the real question is, whether Condit has shown any claim to relief from the loss occasioned to him by such imperfections.

It is admitted by Blackwell that at the time of the exchange, and for some years previous thereto, he had been acting as attorney for Condit in paying taxes on other lands held by him in Wisconsin, and that he was also at the same time employed in the capacity of agent by Condit to sell the Orange property. This fiduciary relation thus existing between these parties, the validity of this transaction must be determined by rules of law which are not applicable to ordinary cases. The confidence which the relation of attorney and client begets between the parties, and the influence which the attorney thereby acquires, has led to a very close

scrutiny of all transactions between them, and the law often interposes to set aside contracts which, between other persons, would be subject to no exception. In such cases, the burden of establishing the perfect fairness, adequacy, and equity of the negotiation is thrown upon the attorney, and in the absence of such proof, courts of equity treat the case as one of constructive fraud. 1 *Story's Eq.*, § 311. In *Gibson* v. *Jeyes*, 6 *Vesey* 278, Lord Eldon expresses the rule to be, "that if he will mix with the character of attorney that of vendor, he shall, if the propriety of the contract comes in question, manifest that he has given his client all that reasonable advice against himself, that he would have given against a third person." In the case of trustee and *cestui que trust*, the rule goes to the extent of creating a positive incapacity on the part of the trustee to purchase the trust estate, and gives the *cestui que trust* power to avoid the conveyance at his option.

Whether the rule relating to attorney and client applies to this case, inasmuch as Blackwell was not Condit's attorney, but agent only *in hac re*, need not be discussed, because the same considerations pertain to contracts of purchase and sale between principal and agent, and they are not allowed to stand unless there is "the most entire good faith, and a full disclosure of all facts and circumstances, and an absence of all undue influence, advantage, or imposition." 1 *Story's Eq.*, § 315. In *Lowther* v. *Lowther*, 13 *Vesey* 103, the Lord Chancellor says, "that an agent to sell shall not convert himself into a purchaser, unless he can make it perfectly clear that he furnished his employer with all the knowledge which he himself possessed." "The agent must conceal no facts within his knowledge which might influence the judgment of his principal as to price or value, and if he does, the contract will be set aside." 1 *Story's Eq.*, § 360 *a.* The transaction must be characterized by the utmost good faith. There must be no misrepresentation, and an entire absence of concealment or suppression of any fact within the knowledge of the agent, which might

Condit *v.* Blackwell.

influence the principal; and the burden of establishing the perfect fairness of the contract is upon the agent. The following authorities support these propositions. *Story on Agency*, §§ 210, 211; 2 *Sug. on Ven.* 887–9, and note; *Parkist* v. *Alexander*, 1 *Johns. Ch.* 394; *Banks* v. *Judah*, 8 *Conn.* 146; *Central Ins. Co.* v. *National Ins. Co.*, 14 *N. Y.* 91; *Huguerin* v. *Basely*, 14 *Ves.* 273; *Lowther* v. *Lowther*, 13 *Ves.* 102; *Selsey* v. *Rhodes*, 2 *Sim. & Stu.* 41; *Fox* v. *Mackreth*, 2 *Brown's Ch.* 400. And in cases where the agent, without the knowledge of the principal, becomes the purchaser, at his own sale, the principal may, at his election, adopt the contract or not.

Was the conduct of Blackwell, in consummating this exchange, as detailed in his own testimony, characterized by that fairness which the law demands?

Blackwell admits, both in his answer and in his testimony, that, pending the negotiation, he told Condit that he had been admitted to practice as a lawyer in the state of Wisconsin, and that he was conversant with the laws of that state in reference to tax titles; in his evidence he says, that the strongest expression he used with regard to the validity of the title was, that he was satisfied that under the provisions of said tax laws, his title could be maintained. It is manifest, and Blackwell admits it in his testimony, that Condit relied entirely upon the knowledge and statements of Blackwell with respect to these titles, because he had not sufficient time to send to Wisconsin and have an investigation made for himself. As before stated, when these representations were made, Blackwell's deeds were not only void, but a large portion of the lands he claimed to hold under them, had been sold for subsequent taxes, and conveyed to other parties. Condit had a right to rely upon these statements, and having done so, Blackwell cannot shield himself by the allegation that he did not then know that the omission of the words "as the fact is," rendered his title void; having declared that he was conversant with the laws of Wisconsin, he cannot be permitted, in equity, to throw the loss occa-

sioned by his imperfect title upon the appellant, by the averment that he did not know that his assertion was not true.

Aside from this consideration, a careful reading of Blackwell's testimony clearly shows that he did not make an open and ingenuous disclosure of material facts in connection with his title. He admits that he knew no taxes had been paid by himself since 1857; that he did not know whether any had been paid for him after that date; that he took it for granted that his lands had been sold for subsequent taxes, and that after the expiration of three years from such sale, the purchaser's title would become absolute as against him by the recording of his conveyance. The following extracts from his own testimony cannot be read without creating the impression that he at least failed to give Condit the full knowledge which he himself had of the uncertainty and risk of his tax titles:

*Quest.* Did you tell Condit that the taxes had not been paid since 1857?

*Ans.* I told him there were unpaid taxes upon the land; exactly what, I did not tell him.

*Quest.* Did you not know they had not been paid since 1857?

*Ans.* No; I did not.

*Quest.* Is that your only reason for not telling him?

*Ans.* I didn't tell him so, for I didn't know that such was the case.

*Quest.* Did you tell him that the taxes on these lands had not been paid for three years?

*Ans.* I told him there were unpaid taxes for previous years; I don't think I mentioned three years.

*Quest.* Did you tell him in that connection, or at any time, that you had paid no taxes on the lands since you purchased them?

*Ans.* I told him that I had paid no taxes, or but very few; and he asked me if I did not run the risk of losing the land from subsequent sales, by reason of the taxes being unpaid,

and I said the only way to guard against that was by paying them.

He further states, that he took it for granted that his lands had been sold for subsequent taxes, but that he had never made any examination of his titles, and did not know whether any deed had been given which would affect them.

That Blackwell had a superior knowledge of the infirmity in his title, which, if he did not suppress, he artfully expressed in a way to quiet when he should have aroused suspicion, is manifest.

The rule of morals, which, in a court of conscience, measures the duty of the agent, required Blackwell to state not only that there were unpaid taxes, but that he did not know that any taxes had been paid in seven years; not only to state that the way to guard against the risk of losing the land was by paying the taxes, but to explain fully and explicitly that he had not examined, and did not know the condition of his title, and that it was more than probable that his lands, or some of them, had been sold from him beyond redemption.

In reply to a further question, requesting him to state— giving the language he used as nearly as he could—what he said in respect to his title, and the laws of Wisconsin in relation thereto, he says : " I told Condit how I had acquired the lands in connection with Howell—about Howell and myself dividing our interest in these lands; I gave him the principal points as fully as I could of the law bearing on such sales; gave him a statement of the proceedings of the principal steps taken in selling and conveying lands for taxes; the effect given by law to such sales and deeds. I remember making this statement almost in these words : I think they were that my own feeling was, that unless the judges before whom such case might come, should suffer themselves to be influenced by popular feeling, I could not see very well how any contested case could well go against the claimant of the land, and that I could not apprehend that the judges were likely to be so influenced. I talked very freely with Condit.

about the lands at that time, and told all about them that was to tell that I knew of.

That Blackwell desired and intended to impress Condit with the belief that the tax titles were valid cannot be doubted, and that his success in so doing resulted from the fact that he concealed what he should have disclosed is equally clear. With a tax title to two thousand five hundred and fifty acres of land, upon which he had paid no taxes for seven years, and which were subject to be sold from him beyond redemption in three years, he asserts that he made no inquiry during all that period in regard to the condition of his title; yet, in effecting the exchange, he assures Condit that if the judges of Wisconsin were men of integrity, he could not see how the claim under his tax titles could fail. If he was wholly unadvised in regard to the situation of his titles, he had no right to make this assertion; if he was advised, he was guilty of positive fraud.

It is insisted that when the exchange was made the agency had ceased, and that the moment the parties began to negotiate with each other, they occupied the position of principals; but it is obvious that the rules of law which restrain dealings between principal and agent, could have no existence if they ceased to apply the moment the parties commenced to treat with each other. There is no evidence of an agreement between them that the obligations which the agency imposed should cease, and that they would bargain about the subject matter, at arm's length, as strangers to each other.

Being satisfied that there was legal fraud in this case, which renders the agreement vicious, and that in equity Blackwell should not be permitted to derive any advantage from it, it is not necessary to discuss at length the question of positive fraud.

The Steele and Pierson transactions are open to criticism. And the fact that immediately after the exchange Blackwell permitted Condit to represent, in his presence, to Richards and to Lent and Brown, without contradiction, that the title

to the western lands was good, is inconsistent with the denial which his answer contains of material allegations in the bill. It is also very difficult to reconcile with the belief that Blackwell was ignorant of the defects in his tax title deeds, the fact, that so soon after the exchange as August 8th, 1865, new deeds were taken to him, and a number of suits instituted in Vernon county to cure such infirmities. His attempted explanation of these circumstances is not at all satisfactory to my mind.

If the case of *The State* v. *Winn*, reported in 19 *Wisconsin* 304, is the law of that state, Blackwell could have compelled the clerk of the county board of supervisors, by mandamus, to execute to him the re-deeds; but a valid sale and conveyance of the lands for taxes under a junior assessment, cut off his title under an earlier tax sale, although his deed was later in date of execution. *Jarvis* v. *Peck*, 19 *Wis.* 74.

Neither can the aid of the judgments in Vernon county be successfully invoked to perfect his insufficient titles. The tax laws of 1859 declare who shall be barred by such judgments, and they could not in any wise affect purchasers of the same lands, at sales for taxes assessed subsequent to those under which they were conveyed to Blackwell; especially so, when as in this case, such subsequent purchasers were not made parties to the foreclosure proceedings.

In my opinion, therefore, the decree of the Chancellor should be reversed, with costs in this court and in the court below; and a decree should be rendered declaring the deed from Condit to Blackwell null and void, directing a reconveyance by Blackwell to Condit of the Orange property with covenants as against his own acts, free from any encumbrance by him created; and also that Condit is entitled to an account from Blackwell of the rents, issues, and profits of the Orange property since the 17th day of June, 1865, deducting therefrom taxes, repairs, insurance, assessments, and other (if any) legal charges against said property; Condit to re-convey to Blackwell any title he may have acquired to the Wisconsin lands by virtue of Blackwell's deed to him.

The whole court concurred.