Gardiner, J.
 

 The defendant, M. Price Moore, was the son and agent of Lewis Moore; the father resided in
 
 *248
 
 New Jersey, and at the time of the sale hereinafter mentioned, was more than seventy years old, infirm in body and- mind; the son resided in New York, where much of ihe real estate of the father was situated, of which he had the management and control, as a general agent for the owner. Prior to August 1841j the defendant, as the agent of his father, who held a mortgage of $4000 against one Wilkes, took possession of the mortgaged premises, and received the rents, amounting to $250 per annum. The mortgagor was hopelessly insolvent, and continued so, according to the evidence, to the time when the suit was instituted. In this situation, a foreclosure of the mortgage was effected, on a bill filed by the agent, in behalf of his father, and a decree for the sale of the premises was entered for upwards of $5000. On the 26th of April 1842, the mortgaged premises were sold at a master’s sale, in the city of New York, and bid in by Aitkin, another defendant, for $1660. The sale occurred at a time when real estate was very much depreciated, when the mortgagee was realizing a rent of $250 from this parcel.
 

 The purchase, as the complainants allege, was made ^or benefit *agenh and the answers of the defendants, in connection with the testimony, leave no doubt in my mind of the truth of the allegation. The defendant Moore states, in his answer, “that he took the particular instructions of his father as to the foreclosure — those instructions leaving it discretionary with him to select the solicitor, and to adjust and manage the business' as he thought proper.” He further states, “ that he was limited by his principal to the sum of $1500, as the price of the property, in consequence of a prejudice in his mind arising from the uncertainty of the ownership of real property in the city of New York, by reason of burdensome assessments, the taking of private property for public purposes, and the inadequate compensation allowed the owners.” This, then,
 
 *249
 
 •was tbe authority and its restriction, and the reason for the limitation. The duty of the agent was to obtain the highest price for the property, as dt constituted the only security of his principal.
 

 We shall see how he discharged this duty. He states, in his answer, that he informed Aitken, who was his friend and legal adviser, that his father had restricted the bidding on his account to $1500, and that he (the agent) would be at liberty to purchase at a sum exceeding that amount; that he did not wish to purchase the premises, in
 
 his own name,
 
 nor was he sure he would do so, in the event stated. He then says, “it was understood between him and Aitken, that if no more than $1500 was bid, it should go for the benefit of the mortgagee ; that if Aitken should choose to bid beyond that —not exceeding $1800 — he might consider such purchase as made on his own account, or on account of the agent, or on their joint account, as he should think proper, or as they should agree.” The effect of this arrangement was, to make it the interest of the parties that the property should be bid off at a sum exceeding $1500, and not beyond $1800. The first would deprive the mortgagee of all interest in the property; and any sum beyond the amount limited by the mortgagee, ^however small, and not exceeding the maximum of $1800, would give Aitken the control of the property, with the liberty to keep it, or a part of it, or, in case he found the purchase a disadvantageous one, to throw the whole of it upon the agent of the mortgagee.
 

 The interest of Aitken required that the premises should bring the least sum practicable beyond $1500, and not more than $1800, at all events. The same was true of the agent; he could neither share in nor acquire the whole of the property, unless the biddings were confined to that limit. This agreement is stated in the answer, and is of itself evidence of a gross abuse of his power and duty as the agent for his father. I have
 
 *250
 
 quoted from the answer of the defendant Moore, as he has stated the case most favorably for the parties.
 

 Aitken says in his answer, that there was no
 
 agreement,
 
 but an
 
 implied understanding,
 
 that, on
 
 completing
 
 the purchase, he was to have a conveyance; and he then adds (with a simplicity that does equal credit to his candor and professional knowledge), that “ this defendant does not consider that he effected the purchase, until it is determined between this defendant and the said Michael Price Moore, which is to have the property,” &c. The effect of his answer is, that the property was bid in, subject to a future arrangement, between the defendants He gives the contract a complexion more favorable to his co-defendant than the latter has deemed it expedieni to assume in his own behalf. According to Moore, Aitken could keep all, if he
 
 chose;
 
 according to Aitken, he was not entitled to
 
 anything,
 
 until it was determined which should keep the property. Aitken’s version is probably the true reading of the arrangement, as he is confirmed by other facts admitted by both defendants. The sale took place on the- 26th day of April 1842, and it was for cash; no money was then or ever paid, except the master’s fees, by the defendant Moore. A year after-war^s’ a mas^er,s was executed *to Aitken, but delivered to Moore by the master; in June 1843, seven days after the death of Lewis Moore, Aitken conveyed by deed to Moore, the defendant, with covenants against his own acts.
 

 'Without looking further, the admissions of the defendant Moore (and those of Aitken are still more explicit) are sufficient to show an arrangement, in relation to the sale of these premises, which placed his interest in direct conflict with that of his principal. The physical and mental debility of the mortgagee were such as to compel him to rely almost exclusively upon his son, who foi years had acted as his agent, and whose interest, as one of those who would probably inherit his property, he
 
 *251
 
 had a right to suppose was identical with his own. Yet the intention of the agent to bid upon the property for himself, as well as the arrangement with Aitkin, if not studiously concealed, was not disclosed to his father.
 

 The prejudice of an old and infirm man,- in reference to property in the city of New York, would seem to have been the result of feelings of some ten years’ standing. They had been overcome in some way, on previous occasions; for the decedent had subsequently made investments in real estate in the city, through the agency of this same defendant, which, at his death, constituted the great bulk of his productive property. No attempt was made to mitigate those feelings, on this occasion, by the obvious explanation, that Eighteenth street was already opened and worked, and that improvements which would require, or assessments which would seriously incumber the property, were not likely to be made.
 

 The sum to be bid was thus limited to $1500, according to the answer. The fact was communicated by the agent, not only to Aitkin, but to three or four other persons, including the master who conducted the sale. The knowledge that $1500 was the maximum valuation of the mortgagee in possession, who really had the sole interest in the land, and who *preferred to lose $3500 of his debt, rather than bid beyond that sum, would, of course, influence materially the judgments of other persons. Under these circumstances, however, the property was advanced to $1660; a sum, which, to my mind, is strong evidence of the real value of the premises; and of the sacrifice made (and the greater one, which it was for
 
 [1]
 
 the advantage of these defendants to make, and which I have no doubt they intended making) of the interest of the mortgagee, when the sale was effected.
 

 By the sale, a rent of $250 was exchanged for $106 in interest, on a credit, and the difference, at the expense
 
 *252
 
 of the mortgagee, put into the pocket of the agent; “owing,” as he states in his answer, to “the uncertain ownership and unsettled state of the title to the premises.” There is no pretence in the answers, that from the time of the auction, to that of the death of Lewis Moore, either the decedent, or any member, of his family, was informed of the circumstances attending the sale, or' of the conveyance afterwards, or that M. P. Moore had any personal interest, direct or contingent, in the purchase. The answers, therefore, alone, show a purchase of the property for the benefit of the agent; this is sufficient to avoid the sale as to him.
 

 There is no distinction in principle, between a judicial and a private sale, where, as in this case, the agent controls it, and the officer acts under his instructions. In such case, the principal contracts for the best judgment, skill and exertions of the agent in his behalf. He was here to determine when the auction should take place, was bound to abstain from all acts calculated to depreciate the property, and to give such information to the bidders in person, or through the master, as were fairly calculated to make it bring its full value. This the law presumes will be done, when a sale is made or procured by the agent, for the benefit of the principal, and that it will not be done, when made or procured for his own benefit. The presumption in the latter case cannot be overcome by proof of his integrity — *it is enough, that his interest is adverse to that of his employer. The law does not stop to speculate upon the probabilities that the agent has resisted temptation; it removes the temptation, by proclaiming, in advance, that he shall not acquire the property. (Story on Agency, § 211; 1 Ball & Beatty 46-7; 6 Vesey 626; 2 Johns. Ch. 104; 11 Paige 26; 3 Id. 180.)
 

 There is nothing in this case to induce a relaxation of the rule. The answers do not assume, that the sum bid was the value of the property. There could be no assent
 
 *253
 
 to the purchase, for the decedent had no information, or suspicion, that it had been made, in whole, or in part, for the benefit of the son. The relation existing between the principal and his agent, with the unlimited confidence placed in the latter, called for the exercise of the most scrupulous integrity, and of a judgment unbiassed by his own personal interest. The defendant, by a voluntary arrangement with Aitlcen, placed himself in a position in which he was compelled to disregard his own interest or that of his employer. The case does not show that he was superior to temptation; on the contrary, the whole transaction, taking his own version of the matter as a defendant and witness, is, to say the least, extremely suspicious, if not actually fraudulent. I think, the decree should be affirmed.
 

 Decree affirmed.
 
 [1]
 

 [1]
 

 Followed in Trewilliger
 
 v.
 
 Brown 44 N. Y. 238; s. c. 59 Barb. 9,