INDIANAPOLIS, PERU AND CHICAGO RAILWAY COMPANY v. TYNG, appellant.

*Fraud — fraudulent intent, how far necessary to establish liability for false representations — circumstances constituting fraud — Evidence — res gestæ.*

In order to recover for damages arising from the false representations of another the injured party is not compelled to prove that the person making the representations knew them to be false, if he assumed or intended to convey the impression that he had actual knowledge of their truth when conscious that he had not such knowledge. The rule in *Bennett* v. *Judson,* 21 N. Y. 238, is thus qualified by later authorities.

Defendant was asked to find a locomotive of a certain kind for plaintiff, a railroad company, to purchase. Afterward defendant called on plaintiff's vice-president and stated that there were in a distant city two locomotives which had been thoroughly repaired; that B., in whom defendant knew the vice-president had confidence, had examined the locomotives. The same day defendant sent B. to the vice-president and B. stated that he had examined the locomotives; that they were good, serviceable engines and cheap at the price, which defendant claimed was $14,000 each. At defendant's suggestion he was authorized to offer $26,000 for the two, which offer defendant stated was accepted, and upon the vice-president saying that he should have a guaranty that these engines were equal to the specifications, defendant replied that he knew the parties and would give the guaranty. The vice-president then paid him $26,000 and $500 for his services in purchasing, and defendant executed to plaintiff a bill of sale of the engines, embodying the guaranty in his own name as vendor. It afterward appeared that B. had not made an examination of the engines; that the price paid by defendant therefor was only $20,000, and that the engines were worthless. *Held,* that defendant was liable to plaintiff for the damage. *Held,* also, that defendant's liability was not affected by the circumstance that the title to the locomotives came to plaintiff through defendant.

The details of the negotiations resulting in the transaction referred to *held* admissible for the purpose of establishing fraud on the part of defendant.

APPEAL from a judgment in favor of plaintiff entered upon the report of a referee. The action was brought against Thomas M. Tyng to recover damages from fraud and false representations of defendant, relied upon by plaintiff's agents and officers. The facts appear fully in the opinion.

*Henry E. Davies, Jr.,* for appellant.

*C. A. Hand,* for respondent.

BRADY, J. This is an appeal from a judgment entered upon the report of Judge SUTHERLAND, as a referee. The following statement, by the respondent's counsel, of the averments in the pleadings and of the facts established on the trial, is adopted as a correct exposition of the material facts.

The complaint charged that, by false representations, the defendant induced the plaintiffs to purchase, through his instrumentality, two locomotives, called the "Maryland" and "Waterford," at $26,000, as the lowest attainable price, and for that purpose obtained from the plaintiffs the $26,000; also $500 as a compensation for himself, when, in truth, the undisclosed vendors of the locomotives sold them for not over $20,000, and the plaintiffs were thus defrauded out of at least $6,500 in cost of the locomotives. And, as a second cause of action, the complaint further charged that the defendant, as an inducement to the plaintiffs to be the purchasers of the two locomotives (which were at a distant place and not seen by the plaintiffs), also misrepresented, or caused to be misrepresented, their character and condition; that having thus secured the plaintiffs as purchasers at $26,000, the defendant, instead of disclosing the names of the true vendors, signed a bill of sale, in which he incorporated the false description, at the same time asking and obtaining from the plaintiffs, as a compensation for his service in effecting the purchase, $500; that the locomotives did not answer to the description, and were comparatively worthless; and that by means of the fraudulent representations and warranty of the defendant the plaintiffs were defrauded of $17,100.

The answer denied the fraud, disavowed responsibility for the condition or character of the locomotives, and asserted for the defendant the position of vendor at $26,500, with the right to gain and retain whatever profit there might be between that and the true price.

By the report of the referee, it was found that the defendant defrauded the plaintiffs, in respect both of the price and of the description, condition and value of the locomotives, and thereby caused a loss to the plaintiffs of $14,000 ($6,000 in price and an additional $8,000 in value), for which sum, with interest and costs, judgment was directed and entered.

The plaintiffs' company and railroad was in Indiana. The locomotives were at a machine shop in Lowell, Mass. The transactions with the defendant, for the purchase, were at New York, and in

them the plaintiffs were ·represented by the late Mr. Francis B. Cutting, who was vice-president of the company and owned a large interest in it. The testimony of Mr. Cutting was not contradicted by the defendant, who did not take the stand as a witness, and there was no conflict of evidence respecting the facts and circumstances of the purchase.

The defendant, as a dealer in railway supplies, became known to Mr. Cutting, through an advertisement, in October, 1864. He contracted for the sale to Mr. Cutting at $16,500 of a second-hand engine (the "Gazelle"), which he was to put in a specified condition within forty or sixty days. To superintend the repairs, then in progress at Jersey City, Mr. Cutting employed one Levi P. Bissel, an engineer recommended to him for that purpose. Shortly afterward the defendant pleading that fulfillment of the contract (under inspection) would produce heavy loss to him, persuaded Mr. Cutting to forego the benefit of the contract and cancel it upon receipt of $1,000, to cover the expense already incurred by plaintiffs by reason of it. This was the first transaction and acquaintance between Mr. Cutting and the defendant or Bissel. Mr. Cutting subsequently gave an invitation to the defendant to "find an engine about the size and form of the 'Gazelle.'"

Accordingly on the 5th or 6th of January, 1865, the defendant called upon Mr. Cutting with something that would "just suit" him, and stated to him that there were at Lowell some second-hand engines ready for delivery which "had been thoroughly repaired and could be bought cheap." He produced two sets of specifications, one of a large engine and one of two smaller engines, and stated that Bissel "had examined those two engines with the specifications that *he would send* Bissel" to him. On the same day Bissel, having been sent by the defendant to Mr. Cutting, represented to him that he had examined the engines and professing to give in detail the results of such an examination, he recommended the two smaller engines, and represented that *they agreed with the specifications in all respects* (except the thickness of tire) and that "they were *good, serviceable* engines and *cheap at the price.*" Mr. Cutting telegraphed to the president of the company and received a reply.

On Monday, the 9th of January, 1865, Mr. Cutting saw the defendant at his office and showed him the telegram. The defendant, after ascertaining what would be Kasson's charge for forwarding, asked

from Mr. Cutting permission to telegraph parties in Boston "for one of those engines, one of the $14,000 engines," and upon Mr. Cutting's saying he *might telegraph an offer* of $13,500 for one of them, the defendant said to him "You will stand a better chance to get them if you will authorize me to offer $26,000 for the two." After some hesitation, Mr. Cutting consented that he might "send the telegram and offer them $26,000 for the two engines," and the defendant undertook to do so. On this occasion the defendant wrote and procured from Mr. Cutting the two papers of that date manifestly intended as mere authentications of Mr. Cutting's offers to unknown vendors through the defendant. They had passed from Mr. Cutting's recollection but were taken by defendant "to show that he was authorized to buy" and confirm the accuracy, even in detail, of his testimony, one of the papers being an offer for one of the engines in accordance with his first proposal, and the other being the final offer of $26,000 for the two as authorized by Mr. Cutting upon the persuasion of the defendant, in view of the difficulty pretended by him in obtaining one at that rate.

On the 11th of January, 1865, the defendant came to Mr. Cutting's office, and represented to him that there had been such delay and unsatisfactoriness in making the purchase by telegraph, that he had himself gone to Boston and had seen the parties, and that they accepted his (Mr. Cutting's) offer of $26,000 for the two engines. Not knowing who were the vendors, nor any thing, except from the representations of the defendant and Bissel respecting the engines, Mr. Cutting said to the defendant that he should have a guaranty that " these engines are equal to the specifications." To which the defendant replied that "he knew the parties and would give the guaranty," and he was advised by Mr. Cutting that, in that case, he had better take from them a counter engagement to keep him right. The defendant undertook to prepare such a guaranty, and for that purpose obtained back from Mr. Cutting his description of the engines. It was also arranged that payment should be made on production of Kasson & Co.'s forwarding receipt, and of this date is the certificate procured from Mr. Cutting by defendant authenticating his power to complete the purchase from the undisclosed vendors. That such was its purpose, appears not only by the testimony of Mr. Cutting, but by the certification of Mr. Cutting's signature by John Parker, cashier of the Phenix Bank.

A day or two afterward, the defendant reported that there was

still delay — "he did not know exactly what" — and·proposed to go on to Boston and see what was the cause of it; and, in view of the trouble he was taking in Mr. Cutting's behalf, said: "Although the purchaser is not bound to pay the broker any commission, yet, in this case, I think I have the right to appeal to your liberality in the matter." In response to which appeal Mr. Cutting consented to allow him a commission of $500.

The defendant also explained that, in order to enable him to complete the purchase and settle with the vendors in Boston, he would need to "have some authority from you to show them that he was entitled to draw." Accordingly, the defendant wrote an authority to draw, which was dated and signed by Mr. Cutting, the amount of the commission being included, ·so that there would be but one transaction. Shortly afterward, the proposed guaranty or bill of sale was shown by defendant to Mr. Cutting, who glanced at it and asked if the· specification was correctly embodied. The defendant assured him that it was, and took it and the authority away.

On the 18th of January, 1865, the defendant telegraphed from Boston that he had drawn for the amount. But no such draft was presented, or in fact drawn, and on the next day, the 19th of January, the defendant called upon me, Mr. Cutting in New York, and stated that, "instead of drawing upon me, he had arranged with parties in Boston to give his own check on the Phenix Bank; that he had given them his own check, and wanted me to give him a check for like amount to make his good." Thereupon Mr. Cutting gave to the defendant his check for $26,500, which was duly paid, and received from him Kasson's receipt, and the receipted bill for $26,000 purchase-money and $500 commission, and the bill of sale dated back by defendant to January 11th, 1865, and the unused authority to draw. And thus the purchase of the engines was con-· summated.

Kasson & Co. forwarded the engines from Lowell to their destination, Peru, Indiana, but were obliged to notify Mr. Cutting of difficulties in running them on with merely their own bulk and weight to transport.

They had to be taken into machine shops, and the question referred by them to Mr. Cutting and by him to the defendant was whether to repair the engines at Buffalo, or forward them as they best could without repair. With the concurrence of defendant, they were forwarded.

When at last the engines reached the plaintiffs in Indiana their true character and condition were discovered by the plaintiffs, who forwarded to Mr. Cutting reports of officers and machinists by whom they were examined at Peru. These reports pronounced the engines in general and in detail to have been falsely described to Mr. Cutting and a fraud upon him and the company and of no value except by weight as old iron.

After receiving these reports in February, 1865, Mr. Cutting communicated them to the defendant, who thought "Mr. Gilman must be mistaken," but finally conceded that he was probably not mistaken in such facts as that there were 109 brass tubes instead of 136 copper ones. Mr. Cutting thought it a matter "he ought to look into" and suggested that the defendant should personally or otherwise test the accuracy of the reports, but the defendant "had not time," and upon being reminded of his guaranty informed Mr. Cutting that what "I guaranteed was that these engines were the same and in the same condition as when examined by Bissel." Mr. Cutting declined to then discuss the question of construction and renewed the suggestion as matter of reputation and good morals that the defendant should give some attention to the reports. The defendant did not acquiesce. Neither did he give any trace of his authority for the specifications, except that it was "parties in Boston" and not Bissel, whom, however, he again "sent around to see him."

Bissel finally confessed in substance that his former report of having made an actual detailed examination was untrue, and he now asserted as his authority for its details hearsay statements of the man who showed him the engines, instead of such an examination. Upon Mr. Cutting's suggestion that in view of the "great difference between Gilman's reports and his own reports" he had better go out to Indiana, of which Mr. Cutting offered to pay half the expense if the defendant would pay the other half; he promised to submit the offer to the defendant, but he did not return and was not again seen by Mr. Cutting.

These developments, inducing Mr. Cutting to suspect that there might also have been fraud in the price, he at an interview with the defendant asked him, "a little abruptly," who was the owner of the engines? The defendant "hesitated a little while and answered, Samuel B. Allen, of Boston." Mr Cutting asked, "did you pay $26,000 for those engines?" Said he, "No; I paid $24,500

for them." Mr. Cutting asked, "Did you get a commission from me of $500 and make me pay $26,000 for engines you had agreed to buy for $24,500?" "Oh," said he, "they cost me, with expenses, more than $24,500." And to the question "What expenses?" he hesitated and finally said "that the engines had cost $24,000 or $25,000, or something; I think $24,750, or something — an additional sum." To the question, "What became of the difference?" he said: "The difference between what Mr. Cutting had paid and what the owner had sold for amounted to about $1,500 and had been divided between the agents in Boston — Whitney, Bridges & Stearns (brokers, like the defendant) — and the defendant, each taking one-half." To the question, "Why did you charge me a commission for doing this?" the defendant answered that at the time the commission was asked and granted "the price was $26,000, but afterward Whitney, Bridges & Stearns had induced the owners to throw off $1,500 from the price."

These statements of the defendant proved also to be untrue. The owners of the engines had been seeking to sell them at $20,000 from as far back as the previous November, and before Bissel was first sent to Mr. Cutting by defendant he was advised of the anxiety to sell. The owners in fact received only the $20,000, less $500 commission deducted by Whitney, Bridges & Stearns, their Boston brokers.

When asked by Mr. Cutting why he did not tell him the truth when he rendered and receipted his bill for the $26,000 purchase-money and $500 commission, the defendant replied that "nine out of ten men would have done the same thing;" to which Mr. Cutting responded with the regret that the defendant was "one of the nine."

The further narrative of Mr. Cutting is but confirmatory of the foregoing summary. He again unsuccessfully urged the defendant to give attention to the matter as "of importance involving a good deal of character." The defendant conceded that he had employed Bissel because he thought his "favorable report of them (the engines) would induce you to buy them." He took no counter guaranty because "he did not consider he was liable on that guaranty." Mr. Cutting ascertained at the Phœnix Bank that the true amount of the check given by defendant at Boston was $23,000 (against Mr. Cutting's check for $26,000), and the payees were Whitney, Bridges & Stearns, the Boston brokers, and he wrote to

the defendant the letter of the 13th of March, 1855, asking him to preserve it, receiving the reply that he would do so. There was some interposition of advice given to defendant by his counsel, Mr. Fithian, respecting the character in which he conducted the negotiation, but Mr. Cutting properly suggested to the defendant that if he proposed to be the real vendor he should have told him "so as to put me on my guard, then we would have dealt equally."

The defendant also said that the specification was not in the handwriting of Whitney, Bridges & Stearns, but would not say in whose handwriting it was.

This is an impressive array of facts, and it would seem to be quite conclusive upon the correctness of the finding of the referee charging the defendant with having made false representations and for an improper purpose. It is nevertheless asserted by his counsel that he cannot be held responsible—that he is not shown to have made them with knowledge that they were false and with intent to deceive as required by law. These elements he claims are absent, and that such absence is fatal to the plaintiff's recovery. Whatever may have been the rule prior to that decision, however seemingly inconsistent with fair dealing and the right of the general reliance of men upon each other for honesty in their transactions one with the other, it was held in *Bennett* v. *Judson*, 21 N. Y. 238 ; that one who without knowledge of its truth or falsity makes a material misrepresentation, is guilty of fraud in legal contemplation as much as if he knew it to be untrue. COMSTOCK, C. J., by whom the opinion of the court was written, all the judges concurring (except SELDEN, J., who expressed no opinion), said : "The question of law was whether the representations could be deemed fraudulent unless they were known to be false," and thus although the decision has been criticised, limited, and finally qualified, the precise point stated was involved and passed upon and settled. It had been discussed by the profession but from a professional standpoint only on authority, and the result of that case was satisfactory to them and to the common sense of the business people of the land. It was rare indeed to find an individual who hesitated to say at once that the positive assertion of a material fact, upon which another was induced to part from his property, should be visited with the same consequences in regard to the transaction, if false, as if the person asserting it knew it to be so. It was a view in entire harmony with

a principle of law which should be universal; that he who unjustly deprives another of his property should be compelled to restore it or its equivalent. It was recognized as a sequence that when the injury was accomplished it was of no consequence to the victim whether his wrong-doer did the mischief knowingly or not. He knew that he could not do it innocently. Having made the assertion and induced reliance upon its truth, he could not in morals, and it would seem that he ought not in law, be permitted to say "I did not make it knowing it to be false, or with an evil design or intent," and thus escape the responsibility which it created. "Whether a party," says Justice Story, "misrepresenting a material fact, know it to be false, or make the assertion without knowing whether it were true or false, is wholly immaterial; for the affirmation of what one does not know or believe to be true is equally in morals and in law as unjustifiable as the affirmation of what is known to be false." 1 Story's Eq. Jur. 193, note j. When a man asserts the existence of a fact, it should be done either upon knowledge or upon circumstances which, when grouped, would show it to be true, always maintaining the ability for his own protection and for the justification of his own conduct of proving it to be so.

No man has the right to affirm to be true what he does not know to be so, either of his own knowledge or as the result of proper and impartial investigation, and therefore susceptible of proof. It cannot be denied that a departure from this rule of conduct has occasioned multitudes of wrongs in society for which no redress could be had without reference to the numerous litigations to which it has given rise, the dishonest practices which it has inaugurated, and the destruction of private character which it has occasioned by the slanders it has circulated. If the rule should ever be adopted in this State that no man shall respond in damages who utters a false affirmation unless he knows it to be false or believes it to be so, and make it with intent to deceive, the legislature should be invoked to destroy it and to declare what is consistent with good morals and fair dealing.

It becomes necessary, therefore, to ascertain in this case the rule which now exists to see how far the case of *Bennett* v. *Judson* has been modified or limited, and whether or not it stands unimpaired. The result is as declared in the recent case of *Wakeman* v. *Dalley*, 51 N. Y. 27, and upon a review of the authorities that an action founded upon the deceit and fraud of the defendant cannot be maintained in the

absence of proof that the defendant believed or had reason to believe, at the time he made them, that the representations made by him were false, and for that reason fraudulently made, or unless it be shown that he assumed or intended to convey the impression that he had actual knowledge of their truth though conscious that he had no such knowledge. The rule thus declared is sustained by the following decisions : *Marsh* v. *Falker*, 40 N. Y. 162 ; *Oberlander* v. *Spiess*, 45 id. 175 ; *Meyer* v. *Amidon*, id. 169 ; *Hubbell* v. *Meigs*, 50 id. 480 ; *Degraw* v. *Elmore*, id. 1 ; *Ross* v. *Mather*, 51 id. 108, and it is the law of this State.

The doctrine of the case of *Bennett* v. *Judson* is not, therefore, overruled, but modified. The facts in that case presented the question stated by COMSTOCK, C. J., fairly and decidedly. The representations were made in belief of their truth, and upon information relied upon. There was no pretense that there was knowledge or belief of their falsity, by the defendant or his agent. The case has sometimes been otherwise interpreted, but the converse of the view just expressed cannot well be maintained. The decision, however, is no longer the unqualified law of the land, and something more than a positive assertion, though false in fact, must be shown by evidence to justify a recovery. It must be proved that the defendant knew, or believed the representations to be false, or that he assumed or intended to convey the impression that he had actual knowledge of their truth, though conscious that he had not. The court of appeals felt bound by the authorities thus to declare the doctrine.

The decisions reviewed, made by the English courts, were to the same effect, but it must, nevertheless, be regretted, that they felt obliged to follow them. It was only necessary to strike from the form of legal responsibility to be created, the charge of fraudulent representation, if that were the objectionable element, and to hold that the statement made being in fact false, and its utterance having occasioned injury to the person receiving and acting upon it, it was a subject for redress. "It should," in the language of COMSTOCK, C. J., "be declared that the law was not so unreasonable as to deny redress in such a case." It would be just to except from the operation of the rule stated, actions for deceit, in representations of solvency, because it may be assumed, that when information of that kind is sought, it must necessarily partake of the character of information only, and not of knowledge, unless by

some special and particular phrase it is intended to be otherwise. It is not ordinarily communicated or employed for personal gain or personal advantage, or for the purposes of barter between the seller and the person giving it.

It thus, however, appears that, although the rule declared in the case of *Bennett* v. *Judson* is qualified; the injured party is not compelled to prove that the person making the representations knew them to be false. If he assume or intend to convey the impression that he has actual knowledge of their truth when conscious that he has not such knowledge, it is enough.

Judged by this standard, and after a careful examination and consideration of the evidence in this case, we feel obliged to say, that there can be no well-founded doubt of the justice of the referee's findings. We do not deem it necessary to express in detail the reasons for this result, but to refer to the facts recited as a complete answer to the assertion, that the evidence given did not warrant them. The defendant was not examined on the trial, and we have not the benefit of any denial or explanation which he might have made or given, nor have we the testimony of Mr. Bissel, so closely identified with the transaction and with the defendant. The defendant has, it is true, invited, by this appeal, a discussion of the facts and circumstances disclosed, but, nevertheless, we shall content ourselves with this mode of dealing with them. It is quite apparent, from the facts established, that the defendant, if he did not know of the falsity of the statements made, at least assumed or intended to convey the impression, that he had actual knowledge of the truth of the representations, as to the condition of the engines, though conscious that he had not; while it is conceded by him that he knew the price to be paid for them was less than the sum he named and received for them from Mr. Cutting, and therefore that his representations in that respect were false. The case thus stands upon the broad ground that the defendant was guilty of fraud.

Having arrived at this conclusion, it is not considered necessary to examine the various phases in which this appeal was ingeniously presented on the part of the defendant. The representations as to condition and price having been declared to be false within the rules of law and the defendant having been the moving and procuring cause of the sale in the character of the plaintiff's agent, it becomes wholly immaterial in what manner he

may have formally changed, if at all, that relation to them. He received their money in compensation for his services in procuring for them the engines and gave his guarantee, it would seem, only as a part of the scheme of fraud which increased his chances of success and rendered discovery the more doubtful. The broker or agent who buys for and with the money of his principal, can acquire no advantage by passing the title through himself. *Bench* v. *Sheldon*, 14 Barb. 66 ; *Moore* v. *Moore*, 5 N. Y. 256 ; *Edmonstone* v. *Hartshorn*, 19 id. 9 ; *Reed* v. *Warner*, 5 Paige, 656. When the existence of fraudulent design is declared, it matters little by what variety of procedure the guilty party endeavors to hem himself in. All his barriers must give way before the crushing vitality of legal principles. Fraud vitiates every thing. Story on Contr., § 495. There is no shield which can protect and no strategy which can save him if the fraud be not waived or condoned and the statute of limitations be not applicable.

These views dispose of the main questions in the case relating to the responsibilities of the defendant growing out of his conduct. In regard to the exceptions it is necessary to say that the evidence in reference to the true condition and value of the engines is in conflict, but the finding of the referee is abundantly sustained. We cannot say therefore that his conclusions on that subject are objectionable.

It must be further said, that the exceptions taken during the trial have no merit and do not warrant us, therefore, in disturbing the judgment. The motion to dismiss the complaint which was denied and to which exception was taken was properly disposed of, and the general discussion of the case and the results arrived at herein are a sufficient answer to the points made on that motion.

The exceptions to evidence worthy of mention are based : *First.* Upon the proposition that Mr. Cutting could not state the terms of his offer, which was in writing, signed by him, or a conversation in reference to a transaction concluded by agreement in writing, or, in other words, could not state the details of the negotiations which led to the signing or execution of these papers or either of them, when it is apparent that they were used only as forming part of the *res gestæ* and could be so employed, the papers being the result in part of the fraud practiced. The evidence objected to was not given to vary the terms of the contract about which there was no dispute. It was for the purpose of demon-

strating the object and design of the defendant and the fraudulent devices which were resorted to, to accomplish them and was clearly competent. Fraud opens the door to investigation and no written instrument thus assailed is entirely protected from the effect of parol evidence. 1 Greenl. on Ev., §§ 283, 284; *Sandford* v. *Handy,* 23 Wend. 260. " The covin," saith Lord COKE, " doth suffocate the right."

*Second.* Upon the ground that Bissel was not authorized by the dedefendant to represent him when it appeared that Bissel was sent by him to Mr. Cutting, having been selected as likely to affect the latter favorably. And when the relation being thus established between them, it appeared that Bissel participated in the representations as to the condition of the engines, and not only failed to inform Mr. Cutting of their selling price of which he was advised in Boston, but also to appear as a witness in explanation of the circumstances or in vindication of his own conduct — a silence in which the defendant also united.

It must be further said that the objection to the introduction of the copy of the specification complained of is not tenable. The whole evidence considered, it is the best conclusion that the reason why the original was not produced was that the copy received was in fact a transcript of the original as presented by Mr. Cutting.

The judgment should be affirmed.

*Judgment affirmed.*