## CAROLINE PORTER

### v.

## CEPHAS M. WOODRUFF.

1. Where the relation of A to B is one of great trust and confidence, A's conduct will be regulated by a law of jealousy. He will not be permitted to keep anything obtained from B under the guise of a contract, unless his title is entrenched in the utmost good faith. It must have been acquired openly, and on a full and frank disclosure of every fact likely to influence B's conduct; and the conduct of A must be shown to be just and honest in every particular.

2. The general interests of justice, and the safety of those who are compelled to repose confidence in others, demand that the courts shall inflexibly maintain the rule declaring that an agent employed to sell cannot make himself the purchaser, nor, if employed to buy, can he himself be the seller.

3. The moment an agent ceases to be the representative solely of his employer, and places himself in a position towards his principal where their interests may conflict, no matter how fair his conduct may be in the particular transaction, he ceases to be that which his service requires and his duty to his principal demands.

4. In such cases the courts do not stop to inquire whether the agent has obtained an advantage, or whether his conduct is fraudulent or not, but if the fact is established that he has attempted to assume two distinct and opposite characters in the same transaction, the courts will not speculate concerning the merits of the transaction, but at once pronounce it void as against public policy.

5. The reason of the rule is, that owing to the selfishness and greed of human nature, there must, in the great mass of transactions, be a strong antagonism between the interests of the seller and buyer, and universal experience shows that the average man, when his interests conflict with his employer's, will not look upon his employer's interests as more important or entitled to more protection than his own.

6. The object of the principle is to elevate the agent to a position where he cannot be tempted to betray his trust. To guard against uncertainty, all possible temptation is removed, and the prohibition against the agent acting in a dual capacity is made broad enough to cover all his transactions.

7. The rights of a principal will not be changed, nor the capacity of the agent enlarged, by the fact that the agent is not invested with a discretion, but simply acts under authority to purchase or sell a particular article at a specified price.

Porter *v.* Woodruff.

8. The right of a vendor of lands to a lien in equity for unpaid purchase-money, is now a part of the established jurisprudence of this state, and will be enforced, not only against the purchaser, but all who claim under him as volunteers or donees.

9. A trustee is bound to make safe investments, such as will yield a reasonable income, and a return of the principal when desired, and he ought not, as a general rule, to invest in second mortgages, but he will not be held personally liable simply because he has done so, in the absence of proof that loss has ensued or will probably ensue.

On bill, answer and proofs taken in open court.

*Mr. Oscar Keen, Mr. S. H. Pennington* and *Mr. Thomas N. McCarter,* for complainant.

*Mr. John R. Emery* and *Mr. Henry C. Pitney,* for defendant.

VAN FLEET, V. C.

This is a bill by a principal against her agent. The complainant charges the defendant with many acts of misconduct in the course of his agency, some of which constitute gross frauds. The relation of principal and agent was formed between the parties in January, 1873. The complainant's husband died November 29th, 1872. She was then about sixty-eight years of age, childless, and without experience in business. She lacked both a knowledge of business and an inclination to acquire it. Her husband, by his will, gave his whole estate to her. His personal estate amounted to about $60,000. He had, by a writing, which has not been put in evidence, but the existence of which has been fully proved, recommended the defendant as a fit person to assist the complainant in the management of her estate. The defendant had been associated with the complainant's husband for many years as a ruling elder in the superintendence of the spiritual affairs of one of the most influential Presbyterian churches of the city of Newark. His reputation as a capable and trustworthy business man stood high. He was president of one of the more prominent fire insurance companies

of the city of Newark. His high religious character, and the position of trust he occupied in the business community, were almost sure to give him the confidence of the most cautious person. Very shortly after the death of her husband, the complainant surrendered into the possession of the defendant all her papers and securities, and requested him to have the safe in which her husband had kept his securities, removed to his office, in order that he might manage her affairs with less inconvenience to himself. This he did. From this time forth until the latter part of December, 1879, the defendant exercised over the securities and moneys of the complainant a dominion almost as absolute as he did over his own. The complainant, in describing her relations to the defendant, says:

"I looked to the defendant for everything without anxiety; I just threw myself on his fidelity, as a child would on a parent, without questioning."

And the defendant, speaking on the same subject, says that the complainant and he were on terms of close friendship and intimacy; that she looked upon him as her adviser, comforter and friend, and that what he did for her was done as a friend, and were such services as a son or brother might render for a mother or a sister, without expectation of compensation, except by way of gift.

This narrative shows that the relation between the parties was one of great trust and almost blind confidence on one side, and complete control on the other. The defendant, therefore, occupied a position towards the complainant where he was bound not only to deal with her honestly and justly, but to scrupulously avoid engaging in any transaction, in respect to her estate, in which his interests might be put in antagonism to hers. He was required, in all things relating to her estate, to subordinate his interests to hers, and carefully abstain from using his power and influence over her for his own advantage, and to her harm. The law by which he was bound to regulate his conduct is a law of jealousy, and under its wise provisions he can keep nothing that he has obtained from her, under the guise of a contract, to which

he cannot show a title entrenched in the utmost good faith. His title must have been acquired openly, on a full and frank disclosure of every fact likely to influence her conduct, and his contract must be shown to have been just and honest in every particular.

The first of the several claims to relief presented by the bill, which·I shall consider, is that in which the complainant charges that the defendant is liable for the profit made on the purchase and sale of certain railroad stock. Among the property which the complainant acquired, under the will of her husband, were sixty-seven shares of the capital stock of the Central Railroad Company of New Jersey. After this corporation became insolvent and passed into the possession of the chancellor, the complainant became very much troubled about what was best to do with her stock, whether to sell it or to keep it. She sought information in many directions, consulted the defendant almost daily, and after undergoing much perturbation of mind upon the subject, at last, under a strong fear that if she continued to hold it, the whole would be lost, she gave the defendant peremptory direction to sell it at $16 a share. This direction was given about the 1st of May, 1878. The defendant did not sell the stock, but caused it to be transferred to his wife, and paid the complainant for it at the price it was then selling for on the market. The amount he paid was $1,072. He did not tell the complainant that he intended to purchase the stock himself, or of his purpose to have it transferred to his wife, but, on the contrary, by his answer, he says that after he made up his mind to buy, he went to the complainant and told her that *a sale had been effected, or could be effected,* at $16 a share. In his evidence, he says that the idea of purchasing the stock for himself, as a speculation, first entered his mind after he had received direction to sell it, and after he had had an interview with Vermilyea & Co., stock brokers of the city of New York, in which they told him that they thought the market price of the stock would advance. At the time he told the complainant that a sale had been effected, or could be effected, at $16 a share, he did not tell her that he had consulted these gentlemen, nor what opinion

they had expressed. After the stock was transferred, the defendant paid to the receiver in charge of the affairs of the corporation under the re-organization scheme, the sum of $500, and in return received an adjustment bond, and also surrendered five shares of stock, and in return received an income-bond. On January 30th, 1880, he sold the sixty-two shares still standing in the name of his wife, for $5,091.75. The defendant's wife had no beneficial interest in the transaction, she paid no part of the purchase-money, and received no part of the proceeds of sale.

The defendant's reticence under the circumstances was not only unnatural, but undutiful. It amounted to a concealment of information which, I think, he was bound to give. He knew that the complainant had long been in a state of painful anxiety about her stock, that she had been reaching out in almost every direction for help, and that she seized upon every scrap of information that came in her way with the greatest avidity; he knew, also, that her mind had been in a very unstable condition as to what it was best for her to do, and that she had great confidence in his shrewdness, as well as in his integrity, and that she would be likely to be strongly influenced by his conduct. (I am thoroughly persuaded that he concealed from her the fact that he intended to buy for the purpose of inducing her to sell, believing that if he told her he intended to become the purchaser himself, she would at once refuse to sell.)

This conviction is greatly strengthened by his subsequent conduct. Shortly after the stock was transferred, its market price began to advance, and the complainant expressed regret that she had sold, and applied to the defendant to know whether she could not get the stock back again. He told her she had spoken too late. He did not acknowledge that he was its purchaser, and frankly state, as I think he should have done, that he was unwilling to return it. Subsequently, when applied to for information as to whom the complainant's stock had been sold, he answered that he did not know, but said it had been sold through Vermilyea & Co. This statement, it will be perceived, involved something more than concealment. The evidence ren-

Porter *v.* Woodruff.

ders it entirely clear, I think, that from the time the defendant made up his mind to buy the stock, up until the evidence of his purchase was discovered, he made a constant effort to conceal from the complainant the fact of his purchase. His motive for adopting this course originally was to prevent the complainant from retreating from the purpose to sell, and he afterwards found it necessary to adhere to it to escape her reproaches for not deal-ing with her openly and fairly.

The legal principle to be applied in deciding whether the de-fendant can successfully resist the complainant's claim, is too firmly established to warrant even the most astute and courage-ous counsel in attempting to overthrow it or to narrow its scope. The general interests of justice and the safety of those who are compelled to repose confidence in others alike demand that the courts shall always inflexibly maintain that great and salu-tary rule which declares that an agent employed to sell cannot make himself the purchaser, nor, if employed to purchase, can he be himself the seller. The moment he ceases to be the rep-resentative of his employer and places himself in a position towards his principal where his interests may come in conflict with those of his principal, no matter how fair his conduct may be in the particular transaction, that moment he ceases to be that which his service requires and his duty to his principal demands. He is no longer an agent but an umpire; he ceases to be the champion of one of the contestants in the game of bargain, and sets himself up as a judge to decide, between his principal and himself, what is just and fair. The reason of the rule is apparent; owing to the selfishness and greed of our nature, there must, in the great mass of the transactions of mankind, be a strong and almost ineradicable antagonism between the in-terests of the seller and the buyer, and universal experience has shown that the average man will not, where his interests are brought in conflict with those of his employer, look upon his employer's interests as more important and entitled to more pro-tection than his own.

In such cases the courts do not stop to inquire whether an agent has obtained an advantage or not, or whether his conduct

has been fraudulent or not, when the fact is established that he has attempted to assume two distinct and opposite characters in the same transaction, in one of which he acted for himself and in the other pretended to act for another person, and to have secured for each the same measure of advantage that would have been obtained if each had been represented by a disinterested and loyal representative, they do not pause to speculate concerning the merits of the transaction, whether the agent has been able so far to curb his natural greed as to take no advantage, but they at once pronounce the transaction void because it is against public policy. The salutary object of the principle is not to compel restitution in case fraud has been committed or an unjust advantage has been gained, but to elevate the agent to a position where he cannot be tempted to betray his principal. Under a less stringent rule, fraud might be committed or unfair advantage taken, and yet, owing to the imperfections of the best of human institutions, the injured party be unable either to discover it or prove it in such manner as to entitle him to redress. To guard against this uncertainty, all possible temptation is removed, and the prohibition against an agent acting in a dual character is made broad enough to cover all his transactions. The rights of the principal will not be changed, nor the capacity of the agent enlarged, by the fact that the agent is not invested with a discretion, but simply acts under an authority to purchase a particular article at a specified price, or to sell a particular article at the market price. No such distinction is recognized by the adjudications, nor can it be established without removing an important safeguard against fraud. *Benson* v. *Heathorn, 1 You. & Col. 326; Conkey* v. *Bond, 34 Barb. 276, 36 N. Y. 427.*

In pronouncing the judgment of the court of errors and appeals in *Staats* v. *Bergen, 2 C. E. Gr. 554, 558,* the present chief-justice has discussed this whole subject with his usual vigor and perspicuity. " The rule," just stated, he says, " is one of public policy. The trustee "—and here, I think, it should be said that the persons referred to are not simply those who are strictly entitled to be called trustees, but the term is used in its most comprehensive sense, and intended to embrace all persons who act in

Porter *v.* Woodruff.

a representative capacity, whether, according to exact nomen-
clature, they are styled agents, factors, executors, administrators
or trustees—"the trustee is not prevented from bidding for
property which he himself sells, on the ground simply of a sup-
position of actual fraud, but because the law has established, *as
an inflexible rule, applicable to every emergency*, that he shall not
place himself in a situation in which he will be tempted to take
advantage of his *cestui que trust*. This is a wise public regula-
lation, intended to protect a species of property which other-
wise would be constantly exposed to peculiar hazard. The
trustee, therefore, must submit to this regulation, and if he does
an act in violation of it, no matter how pure his intention may
be, such act is voidable at the instance of the person whom he
represents.   *   *   *   At these sales, then, the trustee is for-
bidden to purchase, because his interest, as such purchaser, is
opposed to the interest of his *cestui que trust*, and he acts, therefore,
under a bias in his own favor. Nor does this rule rest, to any
considerable extent, in the fact that, in a particular line of cases,
the trustee has peculiar opportunities for the practice of fraudu-
lent acts with regard to the property in his charge. The rule,
to be efficacious, must be general, and the law implies, therefore,
that in all cases of trusts such opportunities may exist, and con-
sequently the prohibition is universal.   *   *   *   So jealous is
the law on this point, that a trustee may not put himself in a
position in which, to be honest, must be a strain on him." The
cases are numerous in which these principles have been enforced
against persons acting in the capacity of agents. I shall cite
only those most pertinent. *Ex parte Lacey, 6 Ves. 625 ; Brook-
man* v. *Rothschild, 3 Sim. 153 ; Rothschild* v. *Brookman, 2 Dow
& Clark 188 ; Gillett* v. *Peppercorne, 3 Beav. 78 ; Moore* v.
*Moore, 5 N. Y. 256 ; New York Central Ins. Co.* v. *National
Protection Ins. Co., 14 N. Y. 85.*\*

It is possible for an agent, dealing directly with his principal,
to make a contract which the courts will uphold, but such trans-
actions, to be maintained, must be characterized by the utmost
good faith. There must be no misrepresentation, and an entire

\* See *Dos Passos on Stocks 213–226 ; Audendreid* v. *Walker, 11 Phila. 183.—*
REP.

absence of concealment or suppression of any fact within the knowledge of the agent, which might influence the principal; and the burden of establishing the perfect fairness of the contract, in such cases, rests upon the agent. *Condit* v. *Blackwell, 7 C. E. Gr. 481.* Such transactions are never upheld, unless it is clearly shown that there has been, on the part of the person trusted, that most marked integrity, that *uberrima fides,* which removes all doubt respecting the fairness of the contract. *Rothschild* v. *Brookman, ubi supra.*

My conclusion is, that the defendant is liable to the complainant for the profit made on the purchase and sale of the complainant's railroad stock.

The second claim to relief which I shall consider is that in which the complainant insists that she is entitled to have the sum which shall be found to be due her in the transaction just discussed, charged as a lien for unpaid purchase-money on certain real estate which she conveyed, at the defendant's instance, to the defendant's wife. This claim rests upon the following facts: In March, 1874, the defendant purchased a house and lot on High street, in the city of Newark, for a residence for himself, for the sum of $15,000. On the 1st of April, 1874, he procured them to be conveyed to the complainant, and paid the purchase-money as follows: The complainant and defendant executed two bonds of $4,500 each, which were secured by two mortgages, made by the complainant alone, on the property conveyed, and the complainant also assigned to the vendor a mortgage held by her against Leopold and Herman Graf for $4,000, and the balance of the purchase-money, viz., $2,000, was paid in cash. The defendant admits that at the time he made this payment he might have had $2,000 of the complainant's money in his hands.

During the year immediately succeeding the conveyance, the defendant says he made improvements on the property which cost $7,000. The complainant continued to hold the title to the property until she severed her relations with the defendant. On the severance of their relations, the complainant demanded that the defendant should take the title to the High street property, discharge her from liability on the bonds which she had execu-

ted in his behalf, and return to her such part of the purchase-money as her money and securities had paid. This was done. The house and lot were conveyed to the defendant's wife January 7th, 1880, and the defendant then paid to the complainant, in cash, in satisfaction of the money and securities belonging to her, which he had used in paying for the house and lot, the sum of $4,594.90. The funds he used in making this payment were the proceeds of the sale of the railroad stock, which the defendant had induced the complainant to transfer to his wife. Under the force of these facts, the complainant insists that inasmuch as the moneys which the defendant paid to her were the proceeds of her property, and were, therefore, in equity hers, and not his, that it should be adjudged that the consideration which the defendant agreed to pay for the conveyance to his wife has not been paid, and consequently that she is entitled to a lien as for unpaid purchase-money.

Two things are undisputed. First, that part of the consideration which the defendant was to pay for the conveyance to his wife, was to make restitution to the complainant, in money, of so much of her property as he had used, at the time of the purchase, in paying for the house and lot; and second, that in going through the form of making such restitution, he simply gave to the complainant what in equity was hers already. If the defendant, in going through the form of paying the complainant, had used money in his possession belonging to her, the legal nature of the transaction would have been so conspicuously clear that it would have been impossible to misunderstand it. So, too, if he had secretly converted one of her securities into money and handed that over to her as payment, though he might have deceived her for the moment, his act would not have constituted a payment, but a fraud. This is exactly what he did do. He converted property which in equity was hers, into money, and attempted to pay her with her own money. He attempted to use that which was hers as his, and to discharge his obligation to her by giving her that which he had attempted, wrongfully, to take from her and to vest in himself. Except we

travesty reason and ridicule truth, it is impossible to call such a transaction a payment.

This conclusion makes it the duty of the court to declare that the whole of the consideration which the defendant agreed to give for the conveyance to his wife has not been given, and this places the complainant in a position before the court where she is entitled to the aid of the court in enforcing her equitable rights against the land conveyed. The right of a vendor of lands to a lien in equity for unpaid purchase-money, has been fully and repeatedly recognized by this court and is now a part of its established jurisprudence. This lien will be enforced, not against the purchaser, but against all who claim under him as volunteers or donees. *Graves* v. *Coutant, 4 Stew. Eq. 763.*

My judgment is that the complainant is entitled to a lien as for unpaid purchase-money, against the house and lot conveyed by her to the defendant's wife, to the extent that the defendant used the money of the complainant in paying the consideration he agreed to give the complainant therefor.

The third claim made by the complainant presents the question whether or not the defendant is liable for $1,000 of the purchase-money of a lot of land conveyed by the complainant to one David Brackin, in July, 1874. The lot was sold for $1,200, $200 of which was paid in cash and the balance, as the complainant alleges, was to be secured by a first mortgage on the property sold. The defendant, she says, had charge of the whole matter, and, instead of securing the balance of the purchase-money by a first mortgage on the lot sold, accepted a second mortgage on another lot, and that since then the first mortgage has been foreclosed, the mortgaged premises sold and the whole of her money lost. I shall not restate or discuss the evidence pertinent to this branch of the case. It is enough to say that, according to my view, the evidence entirely fails to establish a case against the defendant. It should be said that it clearly appears that the complainant is entirely wrong in the facts on which she rests her right to relief. It was not the first mortgage that was foreclosed, but the one held by the complainant. At the sale of the mortgaged premises they were bid in by the so-

Porter *v.* Woodruff.

licitor employed by the defendant, for the complainant, to fore-close her mortgage, for $700.  The complainant refused to take title to the mortgaged premises, and they were afterwards con-veyed to the defendant's daughter by his direction, and he subsequently assumed control over them.  The defendant paid the taxed costs of the suit and the expenses of the sale, but nothing more, though he procured the mortgaged premises to be conveyed to his daughter.  In stating the account between the parties the defendant must be charged with the sum for which the premises were sold, and credited with whatever he has paid on account thereof.

The complainant also seeks to hold the defendant liable for making an improper or insecure investment of her moneys.  In March, 1875, the complainant received from the sale of some land located in Pennsylvania the sum of $6,000, and handed it over to the defendant to invest for her.  The defendant, March 17th, 1875, deposited the money to an account he kept in one of the Newark banks, as trustee.  He is unable to tell how many different trusts this account represented, or when this particular $6,000 was disbursed, or to whom.  On March 6th, 1875, William A. Pruden and Amos W. Austin executed a second mortgage on a lot in Commerce street, in the city of Newark, to the defendant as executor of Robert C. Stoutenburgh, deceased, for $6,000.  The defendant says he invested the complainant's money in this mortgage.  The prior mortgage on this lot secured the sum of $10,000.  The defendant says, before investing the complainant's money in the mortgage just described, he told her it was a second lien, that he was satisfied the security was suffi-cient and that the mortgagors were good and prompt payers, and that she thereupon directed him to make the investment.  The mortgage was not assigned to the complainant at the time the investment was made, but the defendant says he took it from the package containing the papers of the Stoutenburgh, estate and placed it among the papers he held for the complainant.  The mortgage was not formally assigned until after the complainant had revoked the defendant's authority as her agent, and called upon him to surrender her property.  The defendant made seven

endorsements of interest on the bond after he says he placed the mortgage among the papers of the complainant; four of them are made by him as attorney, two as executor and one without any designation.

It is evident at a glance that the defendant's conduct in this transaction is open to the very gravest suspicion. The security, in the first place, was one that a trustee could not accept without rendering himself personally liable in case it proved to be worthless or inadequate. *Gilmore* v. *Tuttle, 5 Stew. Eq. 611.* The defendant, therefore, occupied a position in respect to this security which entirely disqualified him, as the trusted adviser of the complainant, from giving her such counsel respecting it as she was entitled to have. Simply placing the mortgage among the complainant's papers, without other evidence of her ownership, not only put her title to it in a condition of extreme jeopardy, but left the defendant free to use it, as occasion might seem to require, as a security belonging to both funds, and thus make it answer a double purpose. The defendant kept no account of his transactions on behalf of the complainant, and she was, therefore, deprived of the protection which the performance of that duty would have afforded her. The defendant's conduct in this matter deserves, as I think, the severest condemnation.

But while it appears to be very clear that the defendant's conduct in this transaction has been highly improper, still I think it equally clear on the proofs as they now stand that no case is established against the defendant which can be made the basis of relief to the complainant. It has not been shown that the mortgage in question is either a worthless or an inadequate security. No loss has as yet been sustained, nor has any attempt been made to show that the complainant must inevitably or will probably suffer loss. All that has been shown is that the defendant has invested the complainant's money in a second mortgage. I know of no authority which goes to the length of declaring that a trustee shall be liable, whether loss is sustained or not, simply because he has invested the funds in his hands in a second mortgage. He is bound to make safe investments, such as will yield a reasonable income and a return of the prin-

cipal when required. If he does that, though the security he takes may not be the most desirable, he incurs no personal liability. He should not, as a general rule, invest in second mortgages; if he does, he takes the risk of being personally answerable in case loss ensues, but he is not liable, as I understand the rule, simply because he has made such an investment, if no loss has been sustained, and in the absence of evidence that any will be sustained.

The next claim made by the complainant is uncontested. Among the property which the complainant received under the will of her husband were ten shares of the stock of a corporation known by the name of the Peters Manufacturing Company. Dividends, in both cash and stock or bonds, were declared on this stock in 1873, 1874 and 1875. Those of 1873 were thirty per cent. in cash, and forty per cent. in stock; in 1874, forty per cent. in cash, twenty-five per cent. in stock, and thirty-five per cent. in bonds; and in 1875, thirty per cent. in cash, and twenty per cent. in bonds. The defendant collected all these dividends. He paid the cash dividends to the complainant, but had the stock and bond dividends issued to himself as trustee. His explanation or justification of his conduct in this matter is this: he says when the first stock dividend was declared, he inquired of the complainant what he should do with it, and that she replied he might do with it what he liked, or what he had a mind to, and that he understood her by this form of expression to say to him that she meant that he should take it as a gift. When the subsequent dividends were declared, he says he supposed that she entertained the same intention with respect to them, and he procured them also to be issued to himself, though he made no further inquiry of her respecting her purpose, and she made no further declaration of her intention. The defendant sold the stock and bonds thus obtained, in January, 1877, for $1,300. But before making the sale, he had received on the stock so obtained by him dividends in cash to the amount of $561. The defendant, by his answer, admits that he is liable for the value of the stock and the amount that he has received thereon in dividends, and says that he is willing to account to

the complainant for the same, if she insists that he shall do so. She does so insist. This claim is one of the foundations of her bill. The defendant, in the accounting, must be charged with what he received on the sale of the stock and bonds, and also with whatever he has received thereon as dividends.

I shall dispose of the other questions at issue between the parties by simply stating my conclusions, without attempting to review the evidence or stating the argument upon which they rest.

1. The complainant is not entitled to a decree setting aside the deed made by her to the defendant's daughter as compensation for the defendant's services.

2. The defendant, in the accounting, is entitled to a credit of $50 for money paid to the complainant in December, 1879.

3. The defendant, in the accounting, must be charged with the dividends received by him for the complainant on her stock in the American Insurance Company, for the years 1876, 1877 and 1878; also with three sums, of $17.50 each, for unpaid interest on the Graf bonds and mortgages, due February 1st, 1873, August 1st, 1873, and February 1st, 1874; and also with $6.20 which, in his account, he has erroneously charged against the complainant.

The account between the parties will be stated and settled by the vice-chancellor. Either party may bring on the hearing on the accounting on ten days' notice to the other.

The complainant is entitled to costs.