## VALINA R. CROCHERON

*v.*

## EDWARD S. SAVAGE.

[Submitted March 25th, 1908. Decided May 29th, 1908.]

1. A solicitor, who purchases from his client property which is the subject-matter of the employment, must show, not only that the bargain is as good as could have been obtained by due diligence from other purchasers, but also that he gave his client all that reasonable advice against himself which his office of solicitor would have made it his duty to have given the client against a third person.

2. Where a solicitor, who purchased land from his client, was not her general solicitor, but acted solely in prosecuting a claim, as to such land, against a railroad company, and kept his client fully informed as to the negotiations with the company, and the client saw letters written by the company to the solicitor, and in particular one stating that the company was not disposed to make any substantial offer for the client's interest, if any she had, but stating that to close the discussion the company would pay $100 for a quit claim from the client, and where in the interview, which resulted in the sale to the solicitor, the only subject

that was pointedly discussed was the question whether the company had offered more than $100, and the client and her son, who was her adviser, knew as much about the situation and prospects of the land as the solicitor, the solicitor was in such a situation as to qualify him to become a purchaser of the land, provided the price was fair.

On final hearing on bill, answer, replication and proofs.

The bill in this case is filed to set aside a conveyance made by the complainant to the defendant of an interest in a small tract of land in Middlesex county. The property consists of an undivided one-half interest in about three acres of salt meadow lying at the junction of Thorp's creek with Staten Island sound; it is triangular in shape, is bounded on the north by Thorp's creek, on the south by the sound, and extends easterly to the junction between the creek and the sound. It is thus bounded on its two long sides by water, the third or westerly side abuts upon land belonging to other proprietors. It is not accessible except by boat, and that from the sound side only. The railroad of the Port Reading Railroad Company adjoins the tract and lies a short distance to the northeast of the mouth of the creek; the docks and other constructions of the railroad terminal are built wholly across the mouth of the creek and for a few feet in front of the salt meadow lot in question. All parties agree that it has but little value to anyone except the railroad company, and that such value arises from what is called its strategic situation. The railroad company claims title to the whole tract and denies that either of the contending parties in this suit have any title to any part of it or any interest in it.

Prior to 1903 the complainant employed a solicitor to make an attempt to dispose of the property and realize its value. The only obvious customer at that time was the railroad company. After the lapse of some year or two, no result having been reached, the complainant dismissed her solicitor and in the early part of 1903 entrusted the management of the negotiations for the sale of the property to the defendant, who is a solicitor of this court, his compensation for his services in the matter being fixed at one-fourth of the recovery. The defendant took the matter vigorously in hand, opened anew the negotiations, and

interested several of the railroad officials connected with its real estate department therein. These negotiations continued for about three years. During all this period the railroad company denied the complainant's title and claimed title in itself, and, finally, toward the end of the negotiations, practically discontinued the same on its part upon the ground that the whole title was vested in the railroad company. The company meantime had offered $100 for a conveyance from the complainant, and it finally declined any further negotiations. All this is shown by the correspondence between the defendant and the railroad company, by the evidence of the defendant, and by that of the complainant and her son, Jesse O. Crocheron, who was the representative and adviser of his mother, the complainant. It may be said that Mr. Crocheron, who is about forty-two years old, is engaged in the coal business at Rossville, on Staten Island, and he lives in the same house with his mother, and appears to be a man of business capacity and affairs. And it likewise appears that his mother consulted him about the property and its disposition; that he advised with her in relation thereto, and that he had more or less to do with the negotiations and was kept quite fully advised of the whole situation.

The complainant, at the beginning of the negotiations with the railroad company, claimed to own only two-thirds of the undivided half of the disputed territory. The other third was claimed by several persons who were the children and descendants of a deceased brother of the complainant. They are known in the case as the "Virginia heirs." In 1903, very shortly after the defendant was employed by the complainant, these Virginia heirs conveyed all the undivided interest which they claimed to the complainant, for the mere purpose of convenience in making disposition of the land. All the correspondence between the defendant and the railroad company and the officials of its real estate department and Mr. Ephraim Cutter, a solicitor of this court, who in some way represented the railway company, was put in evidence. For the purpose of showing how the negotiations closed the following citations from this documentary evidence is made. [The opinion then discusses the evidence at length. This discussion is omitted.]

*Mr. John J. Enright,* for the complainant.

*Mr. Robert H. McCarter,* attorney-general, and *Mr. William H. Osborne,* for the defendant, Savage.

HOWELL, V. C.

The law has placed rather close restrictions upon the dealings between two parties where one stands in a fiduciary relation to the other. In the case of trustee and *cestui que trust* the restriction amounts to a prohibition. In the case of other fiduciary relationships the burden is cast upon the purchaser of showing that the bargain is, speaking generally, as good as any that could have been obtained by due diligence from any other purchaser. This rule applies to the relation of solicitor and client. Where a solicitor purchases from his client the property which is the subject-matter of the employment, the solicitor must show, in case the transaction is attacked, not only that the bargain is as good as could have been obtained by due diligence from other purchasers, but also that he gave his client all that reasonable advice against himself which his office of solicitor would have made it his duty to have given the client against a third person, or, in other words, he must show that the client was duly informed, duly advised, and that the transaction was fair. In the absence of these requisites the court will set aside the purchase if completed, or refuse specific performance of the contract. In *Edwards* v. *Meyrick, 2 Hare 60,* Sir James Wigram, V. C., states the law to be that a solicitor is not under an actual incapacity to purchase from the client. "There is not in that case the positive incapacity which exists between a trustee and his *cestui que trust,* but the rule the court imposes is that inasmuch as the parties stand in a relation which gives or may give a solicitor an advantage over the client, the *onus* lies on the solicitor to prove that the transaction was fair." *Montesquieu* v. *Sandys, 18 Ves. 302; Cane* v. *Allen, 2 Dow 289.* The rule is expressed by Lord Eldon * * * to be that if the attorney will mix with the character of attorney that of vendor he shall, if the propriety of the transaction comes in question, manifest that he has given his client all that reason-

able advice against himself that he would have given him against a third person. *Gibson* v. *Jeyes, 6 Ves. 266.* * * * In some cases as between trustees and *cestui que trust* the rule goes to the extent of creating a positive incapacity, the duties of the office of trustee requiring, on general principles, that that particular case should be so guarded. The case of solicitor and client is, however, different. * * * The nature of the proof which the court requires must depend upon the circumstances of each case according as they may have placed the attorney in a position in which his duties and his pecuniary interests were conflicting, or may have given him a knowledge which his client did not possess, or some influence or ascendency or other advantage over his client, or, notwithstanding the existence of the relation of attorney and client may have left the parties substantially at arms' length and on an equal footing. *Hatch* v. *Hatch, 9 Ves. 292; Welles* v. *Middleton, 1 Cox 112; Hunter* v. *Atkins, 3 Myl. & K. 113.* See, also, *Hugenin* v. *Baseley, 2 W. & T. L. C. 1156,* and notes (at *p. 1216*).

It was held by the house of lords in *Lewis* v. *Hillman, 3 H. L. Cas. 607,* that in a case where an attorney was able to convince the court that he had a right to purchase from his client he must purchase openly, and if he purchased in the name of a third person as his, the attorney's, trustee or agent, without disclosing the fact, the purchase was void. This case is mentioned for the reason that it appears that in the case in hand the defendant took title not in his own name, but in the name of his clerk, so that under the authority last cited the deed would be void if no disclosure of the name of the true purchaser was made. The defendant testifies that he made such a disclosure to the complainant at the time the deed was executed, and his statement in relation thereto is not denied by her. The point of the case of *Lewis* v. *Hillman* was that there the solicitors put forward their clerk as the real purchaser, when in fact the solicitor himself advanced the money and was the responsible vendee. Here no such fact exists.

The cases concerning this delicate relation between attorney and client are harmonious and of universal application. They have been adopted by the court of errors and appeals of this

state in the case of *Dunn* v. *Dunn, 42 N. J. Eq.* (*15 Stew.*) *431,* and to the opinion in that case of Mr. Justice Magie, afterwards chancellor, nothing can be added. Applying the rule to the case in hand, we find that the defendant was not the general solicitor for the complainant, but acted with relation to the single matter above mentioned; that he kept the complainant fully informed of the progress of the negotiations which he was carrying on with the railway company, and that she saw from time to time the letters written by the railway company's officials to the defendant, and in particular did she see the letter of September 22d, 1903, written by Mr. Loomis to the defendant, in which he says that he is advised that the railway company is not disposed to regard this tract of land of any signal value, or to make any substantial offer for the complainant's interest, if she has any, which seemed doubtful; that he was willing, however, in order to close the discussion and avoid expense to pay the complainant $100 for a quit claim to the company of any alleged interest in the property.

At the interview which resulted in the execution of the deed by the complainant to the defendant, the only subject that was pointedly discussed was the question whether the railway company had offered more than $100 for the land in question. I have been unable to find any fact in the case which was kept from the complainant. When she executed the deed she and her son, who was her adviser, knew as much about the situation, location, value, salability and prospects of the property as did the defendant. It was within sight of her home, and there were annually more or less transactions to bring it to her attention. A perusal of her own testimony shows that she had perfect knowledge of the situation. It is significant that the complainant and her son tell the same story practically, as does the defendant, about the interview of January 3d, 1906, when the deed was executed, and likewise significant that after the proposition had been made by the defendant to purchase the land the complainant and her son adjourned to another room to confer about the matter. I therefore think that the defendant had put himself in such a situation as to qualify him to become a purchaser of the land in question, provided the price was fair.

There was no testimony in the case on behalf of the complainant touching the value of the land which can be relied upon as evidence of its present market value. In fact, it would be difficult to ascertain the market value of a piece of land which was accessible only by boat, and admitted on all hands to be of little or no value to anybody except the railroad company. There was some conversation between the defendant and the railway officials, in which rather large values were mentioned, but these conversations took place after the deed had been executed by the complainant to the defendant, and were quoted by the railway officials and the defendant in negotiations between the railroad company and the defendant for the partition of this land and the straightening of lines between his property and its property in other locations. I do not think that the valuations so discussed could be relied upon as any safe criterion of the present market value of the property. There was no evidence of sales in the neighborhood, nor any direct evidence by experts of the actual market value.

There will therefore be a decree for the defendant.