BESSIE GORDON and SADIE HORDES, complainants-appellants,

*v.*

HAROLD KAPLAN, MOSES REDLER and LESSER LIEBERFELD, defendants-respondents.

[Submitted October term, 1925. Decided February 1st, 1926.]

1. One who accepts employment as an agent to sell real estate for another, whether called a realtor, a broker or a real estate agent, is strictly bound, within the scope of his employment, by the duty of absolute loyalty to his principal. Within that scope profit of the

agent other than the commission or compensation which he is to receive from his principal or with his principal's consent is the profit of the principal, and an attempt by the agent, in whatsoever manner. to divert such profit or any part of it to his own use, is such a breach of his contract of loyalty as will not only make him accountable to his principal for such profit, but will deprive him of his right to the agreed upon compensation or commission.

2. Anyone who participates in an agent's fraud upon his principal, by receiving as such, part or all of the resulting fruits of the fraud, knowing them to be such, is also liable to account to the principal just the same as the agent would have been had such fruits come to him.

On appeal from a decree of the court of chancery advised by Vice-Chancellor Bentley, whose opinion is reported in *99 N. J. Eq. 195.*

*Mr. John W. Ockford,* for the complainants-appellants.

*Messrs. Gross & Gross,* for the defendants-respondents Kaplan and Redler.

*Mr. Marshall Van Winkle,* for the defendant-respondent Lesser Leiberfeld.

The opinion of the court was delivered by

WHITE, J.

The bill alleges that one of the defendants, Kaplan, while acting as complainants' agent for the sale of their tenement-house in Jersey City, "scalped" the sale by interposing another of the defendants, Lieberfeld (whose niece Kaplan was engaged to marry), as a sham purchaser and a pretended reseller between complainants, the real vendors, and one Richard Harold and his wife, who were the ultimate vendees, whereby there was realized an advance in price of $5,000 above the sum complainants accepted, thinking it was the real price, of which advance Kaplan received $1,000 as an alleged commission on the pretended resale (in addition to the commission paid him by complainants), while the alleged

sham purchaser and revendor made a profit of $4,000, both of which amounts, as well as the original commission paid to Kaplan, complainants pray that the defendants may be ordered to account for and pay to them. If this allegation is supported by a preponderance of the credible proofs, complainants are entitled to the relief for which they ask. One who accepts employment as an agent to sell real estate for another, whether he be called a "realtor," or a "broker," or a "real estate agent," is most strictly bound, within the scope of his employment, to the duty of absolute loyalty to his principal. Within that scope his profit (other than the compensation he, as such agent, is to receive from the principal, or with the principal's consent) is the profit of his principal, and an attempt to evade this rule and to secretly retain such profit or any part thereof for himself, besides making him accountable to his principal therefor, is such a breach of his contract of loyalty as deprives him also of his right to receive the agreed upon compensation or commission which the principal was to pay him for his services. *Carpenter* v. *Overland Tire Co., 130 Atl. Rep. 665.* So, also, anyone who participates in the agent's fraud by receiving as such, part or all of the resulting fruits of that fraud, knowing them to be such, is liable to account to the principal just the same as the agent would have been had such fruits come to him.

The learned vice-chancellor who heard the case thought the facts exceedingly suspicious, but not sufficiently so to overcome the absolute regularity of the checks, receipts, deposit entries, &c., which accompanied the alleged pretended resale. We are not particularly impressed by this absolute regularity. If Kaplan and Lieberfeld were "scalping" this sale, all this absolute regularity occurred while they were going through the motions intended to look like, and, in fact (except as to their secret fraud), constituting a real transaction. Naturally they did the things necessary to produce the proper stub entries, deposit entries, checks and receipts usually accompanying such a transaction. They would have been very foolish not to have done so. In order to accomplish the intended fraud (if that is what they were

guilty of) they put through what was in form a real trans-
action, and, consequently, it, of course, appears to have been
put through in the usual way. They could not, in fact, ac-
complish this particular kind of fraud without doing the
things which they did do, any more than they could have put
through a real transaction which was not fraudulent, in this
way, without doing those same things. Naturally, therefore,
the *presence* in regular form and sequence of these necessary
links in the transaction has little evidential value, one way
or the other, on the question of whether the transaction was
or was not fraudulent in the manner here claimed. The
*absence* of some of these links might be quite different.

We think the substantial things which were actually done
in this transaction are more significant than the manner in
which they were done. Those substantial things appear to
us to have been as follows: The owners (complainants)
placed the property in the hands of the real estate agents
(the defendants Kaplan and his partner, Redler) for sale
at a price of $50,000, which agency was accepted. Some
months afterward, and a few days before April 17th, 1922,
Kaplan discussed with Mr. Gordon, an attorney and coun-
selor-at-law of New Jersey and a son of one of the owners
and a nephew of the other, and who represented them, the
question of reducing the asking price and the terms upon
which a sale might be effected, and on April 17th, Kaplan
told Mr. Gordon that "he thought he had a buyer for the
property" and inquired again if $50,000 was the lowest price.
Upon his being informed that it was, Kaplan told Gordon
that "they could not get the prospective buyer [who he said
was one David S. Pine, of Brooklyn] to give more than
$43,000, but that he would take it up with him again."
Later, on the same day, Kaplan came to Gordon's office and
said to him: "Well, I can get $45,000 from Pine, that's the
very best I can get for this property. You know that I under-
stand the value of real estate, I have sold a lot of it up that
way, and I think you ought to take $45,000, and as a mat-
ter of friendship and in order to put the deal through, I will
accept $750 as my commission if you will take that price."

After calling up the owners and consulting with them, Gordon told Kaplan that they could do business if that was the best price they could get, and Kaplan assured him that it was. Kaplan then gave Gordon as a deposit to bind the bargain his, Kaplan's, personal check for $1,000, drawn to the order of Bessie Gordon, one of the owners, stipulating that if a sale agreement should not be signed the check should be returned to him. This check was endorsed and deposited by Mrs. Gordon, the payee, on the 18th of April and duly collected. Mr. Gordon prepared and dated the sale contract on the same day (April 17th) from complainants, as vendors, to David S. Pine, as vendee, and also prepared an agreement as to the amount of the commission. Mr. Gordon procured the signature of one of the vendors to the sale agreement in duplicate the same evening (the 17th) and the signature of the other vendor the next day, April 18th, and on the latter date sent for Kaplan, had him sign the commission agreement, and delivered the sales agreements to him to show to Pine's lawyer, after which Kaplan was to bring Pine to Gordon's office to sign the agreement.

It turned out from the uncontradicted testimony of both Pine and Kaplan, however, that Pine, in fact, never heard of this proposed purchase by him from the Gordons, nor was he consulted about it in any way. He was a light-fixture salesman living in Brooklyn, *who never kept a bank account,* but he had gone into a few real estate speculations as half purchaser with the defendant Lieberfeld on previous occasions where Kaplan was the vendor's agent. He claims to have produced his, Pine's, contributions to these speculations ($500 on one occasion and $3,000 on another) in cash from his own pocket, which is where he says he kept his money. By thus testifying that he made these contributions out of his own cash, which he kept in his own pocket and not in bank, he, in effect, testified that these contributions were not, in fact, made with Kaplan's money, and there is, of course, no proof to the contrary; but where a cash customer like Pine, who does not deal in checks, is an habitual link in the intervening sales chain whereby quick turn-overs are

brought about by the same real estate agent of the original vendors, it becomes after a while a very suspicious circumstance to say the least.

But in the present instance Pine was away "on the road," and never heard of the purchase he was supposed to make from the Gordons. Naturally, therefore, he did not come to Mr. Gordon's office to sign the agreement on the 18th, as promised by Kaplan, and on the 19th Kaplan called Mr. Gordon up and reported that Pine was busy, but would be up to sign the next day (the 20th). On the 20th Pine again did not show up and Kaplan again reported to Gordon that Pine could not come up, but that the whole thing would be cleaned up to-morrow (the 21st). On the 21st Kaplan came to Gordon's office and said: "I don't think Pine wants this property, but a relative of my intended wife will buy it and I will take you over to his house and we will have it signed." They went immediately to the house of the defendant Lieberfeld, whom Gordon had never met before, and after the agreement was read by Gordon, Pine's name was erased and Lieberfeld's name substituted as the vendee, and the agreements were then signed by Lieberfeld. Title passed in pursuance of this contract on May 25th, when Lieberfeld's check for $6,000 and Kaplan's for $2,500, each certified, made up the cash part of the purchase price at the settlement, and upon Gordon then asking Kaplan how it was that he was putting up a part of the purchase-money, Kaplan replied that Lieberfeld was short, and he was putting up $2,500 to help him out.

On April 20th, 1922 (one day before Pine ceased to function as a purchaser in Kaplan's representations to Gordon, and likewise one day before Lieberfeld was substituted in Pine's place as above described), Kaplan offered the property in question at a price of $50,000 to the ultimate, and as it is claimed by complainants, the only real purchasers, Richard Harold and his wife, Adelherd, with whom Kaplan had done business before and who (as he had known for a considerable time) were in the market to purchase just such a property. Kaplan represented to them that the property

belonged to the complainants, and that he was selling the
property on their behalf.    This offer was accepted on the
same day by the Harolds, and as a deposit on account of the
purchase price, Harold gave Kaplan a check for $2,000, dated
April 20th, drawn to Kaplan's order and by him endorsed
and deposited in his personal account on April 21st.    Kap-
lan warned the Harolds not to talk about their purchase
until they got title.    This $2,000 so paid by Harold was paid
by Kaplan by his personal check to Lieberfeld on or before
April 24th, and was used on May 25th by Lieberfeld in
making up the $6,000 he paid in at the settlement on that
date with the Gordons.    The Harolds testified that when the
sale agreement was produced by Kaplan a few days later for
the Harolds to sign, it contained Lieberfeld's name as vendor
instead of Mrs. Gordon's name, and the Harolds were then
told by Kaplan that this was so because Lieberfeld was "a
good friend of Mrs. Gordon's and held the title so as to
transfer it while she was out in the country."    The settle-
ment on this sale to the Harolds took place on May 31st,
whereupon, immediately afterward on the same day Lieber-
feld gave a check drawn to the order of Kaplan and Redler
for $3,500, and Kaplan and Redler gave a check to Kaplan
for $1,000.

The defendants claim that Lieberfeld (who Kaplan testi-
fied is a real estate speculator) was the real but (except to
Kaplan) undisclosed purchaser from the Gordons all the time
and that he paid Kaplan as a deposit on the prospective pur-
chase a check to Kaplan's order for $1,000 on April 11th.
No receipt was taken for this check nor does the check itself
contain any reference to the purpose for which it was given,
but the stub in Lieberfeld's check book states that it was a
payment on account of this alleged purchase.    Lieberfeld also
testified that he intended to take Pine into the deal and take
the contract in his name, but that at the last moment he
could not find Pine and so had to take the contract in his
own name and to borrow $2,500 from Kaplan in order to
put it through, instead of having Pine supply this $2,500
as he, Lieberfeld, expected.    He further testifies that on the

same day upon which he signed the contract for the purchase from the Gordons and immediately after his doing so (which date he fixes as the 18th and not the 21st, as testified by Mr. Gordon) Kaplan came to his house and was employed by him to resell the property if he could find a purchaser at the price of $50,000, and that he agreed to pay Kaplan if he succeeded in so doing a commission of $1,000. All three defendants say that the $3,500 paid to Kaplan and Redler by Lieberfeld was a return by the latter of the $2,500 advanced by Kaplan and the payment of the $1,000 commission for the resale to the Harolds; and Kaplan and Redler say that of the $2,500 advanced by Kaplan to Lieberfeld, $1,500 was supplied to Kaplan by the firm of Kaplan & Redler, and that the $1,000 paid by that firm to Kaplan out of the $3,500 Lieberfeld check was a return to Kaplan of the $1,000 advanced personally by Kaplan, the $1,500 contributed · by the firm and $1,000 commission also included in the Lieberfeld $3,500 check being retained by the firm. All of this check payment story is corroborated absolutely by the checks, the stubs and the bank deposit book entries, and it is not surprising that the learned vice-chancellor was impressed (as we think unduly) by these documentary sign posts at each turn as he was led through this complicated labyrinth. In addition to the above-mentioned circumstances it also appeared that Lieberfeld had made other payments, besides the $1,000 check of April 11th, to Kaplan in the matter of real estate purchases by the former from the latter as agent, in one of which at least (where the payment took place only two or three weeks before the present transaction) the deed (as Kaplan attempted to have done here but was prevented by the Harolds) was made direct from the original vendors to the ultimate purchaser, although Lieberfeld, through his shadow-man, Pine, was an intermediate buyer and reseller, and also there were several checks of Lieberfeld's indicating profit payments to Pine upon real estate-contract transactions in which Kaplan also seems to have participated as the vendor's agent.

The above-recited circumstances taken together seem to us to give to the transaction such a suspicious taint as to render it quite obvious that if, in fact, the sale to the Harolds on the 20th took place before the actual closing of the contract of sale to Lieberfeld by his signature thereto on the 21st, Kaplan was guilty of perpetrating not merely a technical, but an intentional moral fraud upon his principals by diverting from them $5,000 of the purchase-money for which, as their agent, he sold the property to the Harolds. A careful consideration of all of the evidence convinces us that the date (the 21st) testified to by Mr. Gordon, and not the date (the 18th) testified to by Lieberfeld, is the true date when (after Pine had failed to appear on each of the three succeeding days after the 17th, which is the date which the written contract bears) Lieberfeld's name was substituted for that of Pine, and he signed the Gordons' sales contract. According to the circumstances established by the evidence in this case there was no contract legally binding upon either party until Lieberfeld executed the written contract on the 21st, and, consequently, until that time, Kaplan's loyalty obligation to the complainants remained in full force, and he was bound to secure to them the benefit of the sale he made in the meantime to the Harolds for a higher price. After the sale by him to the Harolds, his participation in the signing and delivery of a contract from his principals to Lieberfeld at a lower price than the Harolds were paying, without disclosing the fact of the sale already made to the Harolds, was a fraud upon the rights of his principals and a violation of his duty of loyalty to them.

But is Lieberfeld to be held accountable for the $4,000 which came to him as the result of this fraud? That, of course, depends upon whether he was a party to the fraud or had knowledge of it when he accepted the benefit of its fruits. We think the evidence clearly indicates that Lieberfeld as well as Kaplan knew quite well all along that it was Kaplan's fraud and nothing else which was to produce the profit which they subsequently divided in the proportions and in the manner above mentioned between them. We think the

delay in having Lieberfeld bind himself to purchase from the Gordons was for the purpose of playing safe by first being sure of the sale to the Harolds, and that being so, of course, Lieberfeld, knowing as he did that Kaplan was the Gordons' agent, knew perfectly well that he was entering into a fraudulent scheme, and the profit which he subsequently received he knowingly received as the fruits of that fraud.

We conclude, therefore, that the defendants must account to complainants for their profit—Lieberfeld for the $4,000 which he received and retained, and Kaplan's firm for the $1,000 which it received, and that the defendant Kaplan, or his firm, must be decreed to have forfeited the original commission of $750 paid to Kaplan by the complainants and to return that payment to them.

The decree of the court of chancery is therefore reversed, and the case remanded to that court, in order that a decree may be made in accordance with the views herein expressed. The costs are to be paid by the respondents.

*For affirmance*—KALISCH, J.   1.

*For reversal*—THE CHIEF-JUSTICE, TRENCHARD, PARKER, MINTURN, BLACK, KATZENBACH, CAMPBELL, LLOYD, WHITE, GARDNER, VAN BUSKIRK, MCGLENNON, KAYS, HETFIELD, JJ.   14.