Complainant, Nellie Dwyer, brings this bill of complaint for an accounting. The defendant, J. Glenn Anderson, is a member of the bar and a solicitor of this court.
In March, 1930, complainant was engaged in litigation with her husband over joint savings and also the custody of the children of their marriage. She engaged the services of the defendant as her solicitor. Among the sums of money in litigation and dispute between complainant and her husband was some $28,000. An order of this court was entered restraining complainant from withdrawing funds on deposit in bank, but the funds had already been withdrawn according to complainant on the advice of defendant who brought her to the National Newark and Essex Banking Company *Page 211 
and opened an account in that institution in the name of Catherine C. Minahan, a niece of complainant and a former stenographer in defendant's office. This, according to the defendant, was done because he thought that "it would be best for me to have a certain amount of surveillance of the money," and again, although he says that complainant desired to deposit the money in the name of her sister, he advised her that of the two names "Miss Minahan's would be better, because Miss Minahan was a younger woman and was available." The money on deposit in Miss Minahan's name, the defendant procured her signature to blank orders — one on December 3d 1930, for $15,000, which was endorsed "Chester Bodenhoff," and the other dated December 19th, 1930, for $10,000, which was endorsed by Harry Jacobson and John H. Grossman. Bodenhoff deposited the order for $15,000 in his personal account in the National Newark and Essex Banking Company and drew a check to the Bodenhoff Company, Incorporated, for $12,000 and another to the defendant, Anderson, for $3,000. Bodenhoff and Anderson are officers of the Bodenhoff Company, Incorporated. Anderson at that time was its president. Two stock certificates, one for eighty shares of preferred and another for forty shares of common were issued to complainant for the $12,000. Bodenhoff controlled the common stock. Complainant says she knew nothing of the stock transaction until she learned upon inquiry at the bank that all of her money had been withdrawn with the exception of a couple hundred dollars. She immediately demanded her money from Anderson and then found that he had purchased stock in her name in the Bodenhoff company, and some time later, Anderson told her that she had executed a power of attorney giving him the right to invest and reinvest her moneys and to pay the income by way of dividends to her. The power of attorney purports to have been signed and acknowledged by complainant before a Mr. Turesky, who is employed in the office of Mr. Anderson. Turesky says that Anderson dictated the document which Anderson denies, saying that Turesky drew it. The undisputed fact is that the instrument or its effect was never read or explained to her. *Page 212 
Turesky simply took her acknowledgment. She says she did not know she had signed such a document and I believe her.
The second order for $10,000 was drawn on December 19th, 1930, and was endorsed by Harry Jacobson and John H. Grossman. This withdrawal of complainant's money is not explained by the defendant except that he says he returned this money to the complainant by two checks, one dated January 9th, 1931, signed by C.S. Park, drawn on the Fidelity Union Trust Company and payable to Colins Park for $5,000 and endorsed payable to complainant, and the other bearing the same date by the same drawer payable to the same drawee and endorsed the same way to the complainant. Finally a check was made on July 31st, 1931, for $2,675.89, drawn on the National Newark and Essex Banking Company on the account of "J. Glenn Anderson, trustee." This latter check represents the balance of the $3,000 paid to Anderson by Bodenhoff after deducting a fee.
The complainant is an unintelligent person and one who lacks ordinary business experience. Her frame of mind during the happenings recited is best described in the words of the defendant, in that part of his testimony on the hearing before me wherein he says, in referring to the litigation between complainant and her husband that, "after that hearing she was almost frantic because of the fact that the award of the children had been made to her husband."
After the proceedings in which the custody of the complainant's children was awarded to her husband and the moneys deposited in the bank in Newark, Anderson added terror to this frantic condition of mind. He advised her to go with her children to Suffern, New York. She was brought there in an automobile by a Mr. Roberts, a New York lawyer, whom she consulted at the suggestion of Anderson. She was told that she had to remain in Suffern and could not come to New York. Later, she and the children were transferred during the night in an automobile to Newburgh, New York. She was scarcely settled there when she received a telephone call, and two men following up the telephone call waited on her saying that, if she remained in Newburgh any longer the *Page 213 
detectives would come and arrest her. Thereupon she was transferred to Albany. Being without funds, she called Roberts, the New York lawyer, on the telephone, as a result of which Anderson sent her $50. She was warned not to go down to New York City or over to New Jersey for a long time.
The defendant admits that he introduced her to Roberts and that he dispatched Paul Kleinberg to Albany to see the complainant. He does not deny the fear which complainant claims he engendered in her for the safety of her children and the danger of arrest, for all of which from the testimony there was no basis in fact. Lack of intelligence, plus terror, caused her to follow his every suggestion with childlike simplicity.
An attorney-at-law is a quasi-public officer. He is an officer of the court and charged with the duty of assisting in its administration. Both courts and lawyers should welcome any inquiry into the fairness of transactions between attorney and client, and courts should never hesitate to condemn where the conduct of the attorney has been unconscionable. In no other way can the high reputation of the legal profession, of which its members are justly proud, be maintained. Raimondi v. Bianchi,100 N.J. Eq. 238. The confidence which the relation begets between attorney and client, and the influence which the attorney thereby acquires, has always led to a very close scrutiny of all transactions between them. The burden always rests upon the lawyer to establish perfect fairness, adequacy and equity of negotiations with his client, and, in the absence of such proof, courts of equity treat the case as one of constructive fraud.Condit v. Blackwell, 22 N.J. Eq. 481. Here, the attorney takes the position that when he invested $12,000 of his client's money in the Bodenhoff Company that complainant knew of the transaction and that she was content. She denies that she knew or consented to the investment of her money. I believe her testimony for the reason that the defendant withdrew through the medium of Miss Minahan, the trustee, not $12,000 but $15,000, $3,000 of which Bodenhoff made payable to J. Glenn Anderson and *Page 214 
which he deposited in the account of "J. Glenn Anderson, trustee." If complainant knew that the stock for $12,000 was to be purchased for her, the withdrawal would have been for the exact amount of $12,000. In transactions such as these, the court leans most strongly against the attorney, who, while acting as such, has business relations with his client on his own account.Perkins v. Deal Beach Realty Co., 92 N.J. Eq. 526.
The evidence satisfies me that the case under consideration presents more than constructive fraud. I find as a fact that there was actual fraud committed by the defendant. He was dealing with an ignorant woman, who, because of her troubles at the time, according to his own testimony, was "almost frantic." He added to her frantic state of mind by transferring her from Jersey to Suffern, to Newburgh and to Albany upon the pretense that detectives were after her. When she expressed the desire to place her money in the name of her sister he persuaded her to appoint her niece as trustee because he wanted surveillance of the money, and for the further reason that Miss Minahan wasavailable. The conclusion is inescapable that the defendant desired surveillance of the money and a trustee who was available in order that he might conveniently carry out the intention formed in his mind to possess himself of complainant's money for his personal use.
A court of equity intervenes upon consideration of public policy, to prevent fraud and abuse of confidence and influence, and to compel fidelity in the performance of fiduciary duty. Relief will be afforded in equity in all transactions in which influence has been acquired and abused, in which confidence has been reposed and betrayed. Proff v. Shirvanian, 110 N.J. Eq. 639.
Decree will be entered for the sum of $12,000, together with interest and costs. *Page 215