The complainant, on or about December 8th, 1925, appointed a committee to seek for it the acquisition of land and premises to be used by it as a headquarters for the transaction of its business. On December 15th, 1925, the committee unanimously reported in favor of purchasing the premises No. 165 South Orange avenue, in the city of Newark, for a permanent home. These premises were then owned by Markus Brown and Minnie Brown, his wife. The daughter of the owners, Anna Brown, some time in the fall of 1925, caused to be inserted in the Newark Evening News
(a newspaper), a notice, or advertisement, offering this same property for sale. The advertisement was inserted in the newspaper between November, 1925, and January, 1926. In response to the advertisement, the defendant, who was then counsel to the complainant, visited Anna Brown at her office and was then and there told by her that her parents would sell the property for the sum of $15,000. Rashkes offered a lesser sum, whereupon, Miss Brown put Rashkes in communication with her parents. There was a conference between him and them in consequence of which, he agreed to purchase *Page 445 
the property for the sum of $14,200. A contract to sell and purchase for that sum was executed by the owners and Rashkes — who represented himself as the purchaser. As a deposit on the contract, Rashkes paid the sum of $1,000. It does not appear that Rashkes ever acquainted the complainant, or its committee, of his negotiations with the Browns. The association voted to pay $18,000 for the property but its minutes do not indicate from whom it was to make the purchase. The minutes do show that on January 19th, 1926, Rashkes reported "that contract has been drawn for purchase of building. A deposit of $2,000 being given in closing of title on March 10th. Price $18,000."
On December 21st, 1925, the officers of the association signed a check for $2,000 payable to the order of George Franklin. The check bears this notation: "Deposit on building No. 165 South Orange Avenue." And it is endorsed "George Franklin, Genevieve Franklin, for deposit White Garage Company." It was deposited on December 24th, 1925, in the Federal Trust Company, of Newark, in the account of the White Garage Company. The defendant was an officer of the White Garage Company; and he was the only officer of that company who was authorized to sign checks on its account in the Federal Trust Company. On the same day, December 24th, 1925, when the White Garage Company deposited the check for $2,000 to its account, a similar amount was withdrawn from that account. It does not appear just how the Franklins were interested in the property. Of course, we may surmise; the defendant could probably tell, but he has not chosen to do so.
When the title to the property was conveyed to the complainant, on March 9th, 1926, the grantors were represented by Adolf Altman, a lawyer located in the city of Newark. Altman, then, also represented the Wallace Building and Loan Association who held a mortgage on the property. He submitted at the hearing, a closing statement of the transfer of title as follows: *Page 446 
 "March 9, 1926.
 Statement in re sale of premises 165 So. Orange Avenue for Markus
Brown and Minnie Brown, his wife, to Sun Building Loan Association
Purchase Price ........... $14,200.00 Deposit ................. $1,000.00
Insurance $7,000.00 ...... 22.35 Wallace Building 
Insurance 1,500.00 ....... 3.75 Loan Association ....... 5,290.92
 ___________ Taxes 1926 .............. 54.34
 $14,226.10 Water ................... 5.00
 6,350.26 __________
 __________ $6,350.26
 $7,875.84"

On the last mentioned date the Browns conveyed the title, not to Rashkes, but to Louis Strijesky. Strijesky, in turn, on the same day, conveyed the premises to the complainant. The conveying deeds were recorded consecutively in the office of the register of the county of Essex on the following day. Strijesky, after the institution of this suit and before the hearing, departed this life. His testimony was taken by deposition at his bedside in a sanitarium. He was an attorney of this state and had served part of his law clerkship in the defendant's office. He was acquainted with the defendant since the year 1920. On different occasions, he had signed papers at the request, and for the benefit, of the defendant. In the transaction incident to the conveyance of the complainant's property, he acted gratuitously and as a declared "dummy" in behalf of Rashkes. He had no interest whatever in the purchase of the premises No. 165 South Orange avenue, Newark; he had never asked Rashkes to purchase it for him, nor did he constitute Rashkes his attorney or agent for the purchase of it; he paid no money on account of the consideration of purchase, nor did he receive any consideration for the part he played in connection with the sale to, or conveyance from, him. He had never seen the building on the premises in question until after it was purchased and was occupied by the complainant. Strijesky, throughout his testimony, manifested his want of interest in the transaction. He indicated that he was just an intermediary or conduit, for the passing of the title from the Browns to the complainant, and that he became so at the request of Rashkes. At the passing, *Page 447 
or transfer, of title from the Browns to Strijesky, and thence to the complainant, the defendant appeared and acted as the counsel for the complainant and, evidently, for Strijesky.
Rashkes submitted an account of the title passing, or closing transaction, to the complainant as follows:
"Meyer Rashkes
 Counsellor at Law
 Union Building
 9-15 Clinton St., Newark, N.J.
 Adjustment of the title No. 165 South Orange Avenue, Newark,
N.J., between Sun Building Loan Association and Louis Strijesky.
 Adjustment as of March 9, 1926.
............................................................................
Purchase Price ................. $18,000.00
Fire Insurance ................. 22.35
Fire Insurance ................. 3.75
Back Shares .................... 3,251.58
 __________ $21,277.68
Deposit ........................ $2,000.00
To Wallace B. L. Ass'n (as
 per statement and as per B.
 L. statement) .............. 8,542.55
Tax apportionment .............. 54.34
Water apportionment ............ 5.00
No rent apportionment
 __________ 10,604.89
 ___________
 Balance $10,672.59
 Statement of Moneys Received from Sun Building Loan Association
in connection with purchase of premises No. 165 South Orange
Avenue, Newark, N.J., and disbursements made.
............................................................................
By check ............................... $10,450.00
Agreements ................... $10.00
County, Supreme and tax
 search, etc. ............... 75.00
Closing of Title ............. 15.00
Survey ....................... 18.00
Recording of Deed ............ 5.00
Paid to obtain deed .......... 10,672.59
 __________
 $10,795.59
 By check ............................. 10,450.00
 __________
 Balance due $345.59"
 *Page 448 
The complainant charges the defendant, in effect, with "double dealing," and with inequitably obtaining, and retaining, a secret or unjust profit. This profit, it seeks to recover. The defendant filed an answer to the bill of complaint, but he offered no defense at the hearing; he rested at the close of the complainant's case. Counsel for the defendant questions the court's jurisdiction.
This suit was brought by the liquidator of the building and loan association; he is the representative of not only the complainant but its shareholders and creditors as well. The initiation of this suit requiring the defendant to account for the moneys received by him while acting in a fiduciary capacity as counsel for the association, is entirely proper. Williams v.McKay 40 N.J. Eq. 189. The complainant charges the defendant with the fraudulent application of its moneys to his use; and that such application he endeavored to unjustly conceal — and actually concealed from the complainant for and through a long period of years, or for approximately nine years after the transaction had occurred, when the liquidator discovered it for the first time and, thereupon, instituted this suit.
That the defendant in the stated transaction occupied a fiduciary or trust relation is undoubtedly true. "In the conduct of his employment, the attorney must consult his client's interests in preference to his own. He is not permitted, therefore, to make any profit out of the employment, other than his due compensation, except with the knowledge and consent of his client; for all such profits he must account, and if necessary, will be treated as a trustee. When an attorney has the charge of, or is employed to conduct a judicial sale of property, he cannot become the purchaser without full explanation and information given to his client of his intention." 2 Pom. Eq.Jur. (4th ed.) 2066, 2071; Brown v. Bulkley, 14 N.J. Eq. 451; Dunn v. Dunn, 42 N.J. Eq. 431; Crocheron v. Savage,75 N.J. Eq. 589; reversing 74 N.J. Eq. 629. An attorney cannot act on behalf of two opposing parties: and even though he may act for two parties in matters which are uncontested, his conduct is open to the most careful scrutiny. He is obliged to exhibit the most perfect good *Page 449 
faith. He cannot prejudice one client for the benefit of another. A scriptural passage which succinctly expresses the principle under consideration is found in Matthew vi, 24:33, as follows: "No man can serve two masters; for either he will hate one, and love the other, or he will cling to one, and slight the other. Ye cannot serve God and mammon."
The concurrent jurisdiction of equity in matters of account is always exercised where the complainant's right to relief rests upon the existence of a fiduciary or trust relation.
"The most important, comprehensive and multiform remedy of the concurrent jurisdiction which results in pecuniary recoveries is that of accounting. The variety of its uses and possible applications is practically unlimited; it can be adapted to all circumstances and relations in which an account is necessary for the settlement of claims and liabilities and for the doing of full justice to the litigant parties. Among the most common instances in which this remedy is employed by courts of equity are the ascertaining and settlement of claims and liabilities between principals and agents and between all other persons standing in fiduciary relations to each other; * * *." 1 Pom.Eq. Jur. (3d ed.) 236, 237.
"The instances in which the legal remedies are held to be inadequate and therefore a suit in equity for an accounting proper, are: * * * 3. Where a fiduciary relation exists between the parties, and a duty rests upon the defendant to render an account." 4 Pom. Eq. Jur. (3d ed.) 2798, 2799.
This jurisdiction is exercised by the court of chancery in compelling a broker, agent or attorney to account for a secret profit made by him on the purchase of real estate for his principal.
In H.J. Jaeger Co. v. Hannan, 90 N.J. Eq. 396; affirmed,92 N.J. Eq. 257, Vice-Chancellor Lewis said:
"I think there is ample evidence in this case, direct and positive, with strong corroborating facts and atmosphere to establish the fact that Hannan, through his relations with Jaeger, was acting as the agent for the complainant, and that while so acting in negotiating the purchase of the land in question, maneuvered and manipulated a sale from the owner to a dummy and then resold to his principal at a profit. *Page 450 
The exact amount of this profit is not disclosed by the proofs, but, when ascertained by a proper accounting, the defendant should be decreed to pay that amount to the complainant.
"The only doubt, in my mind, is whether complainant has not an adequate remedy by law, either for damages or an action inquasi-contract against Hannan to recover the amount of Hannan's profit. Dickinson v. Updike, 49 Atl. Rep. 712.
"But I am satisfied, after consideration that the relief here sought is of a clear equitable nature, and that a decree in accordance herewith should be made."
Vice-Chancellor Stein, in Dwyer v. Anderson, 113 N.J. Eq. 210,
stated:
"A court of equity intervenes upon considerations of public policy, to prevent fraud and abuse of confidence and influence, and to compel fidelity in the performance of fiduciary duty. Relief will be afforded in equity in all transactions in which influence has been acquired and abused, in which confidence has been reposed and betrayed."
See, also, Proff v. Shirvanian, 110 N.J. Eq. 639; Raimondi
v. Bianchi, 100 N.J. Eq. 238; reversed, 102 N.J. Eq. 254.
In Kelley v. Repetto, 62 N.J. Eq. 246, the court said:
"His [the attorney's] relation to her was fiduciary, requiring from him entire frankness and candor."
In Citizens Loan Association v. Lyon, 29 N.J. Eq. 110,
Chancellor Runyon said:
"Where there has been a waste or misapplication of the funds of the corporation by the officers or agents of the corporation, a suit in equity may be brought in the name of the company to compel them to account for such waste, or misapplication or breach of trust." French v. Armstrong, 79 N.J. Eq. 283.
To the contention of counsel for the defendant charging the complainant with laches for neglecting to proceed against the defendant after so long a period, the answer is that the liquidator of the complainant company upon taking over the books and records of the association, discovered a record of the transaction and immediately instituted this suit. Under such circumstances, equity will accept jurisdiction and thus will not permit the statute of limitations to give aid and *Page 451 
comfort to a transgressor by barring relief to a victimized client who has exercised due diligence. Equity will not grant a certificate of "safe conduct" to a deceiver because of an apparent statutory bar where a timely and equitable protest of his misconduct is made and a reasonable appeal for relief is demanded. "Equity helps the vigilant and not those who sleep."
In Holloway v. Appelget, 55 N.J. Eq. 583, the court said:
"The question is whether, in equity, Mr. Holloway is entitled to invoke the statute of limitations in bar of Appelget's action at law. In most of the cases the bar has been set up in suits in equity instituted for the purpose of obtaining relief in instances of fraud. There, however, is no reason why a court of equity should not, by the use of its injunctive power, disarm a defendant from using the statute fraudulently in an action at law. In the case of Freeholders of Somerset v. Veghte, 15 Vr.509, where it was held that a fraudulent concealment of a cause of action was no answer to the statute in an action at law, it was admitted that relief could be successfully sought in equity.
"It also appears that the equitable relief here invoked has been granted mostly in cases where the act out of which the cause of action arose was a fraudulent act in its nature self-concealing, such as embezzlements or thefts carried out by the falsification of accounts or vouchers. But it seems clear that a court of equity will interfere, although the cause of action may not have arisen out of a technically fraudulent act, if the defendant has employed any means to mislead the plaintiff, or to hide from him the fact that a cause of action has arisen."
In Giehrach v. Rupp, 112 N.J. Eq. 296, Judge Wells said:
"It is a well settled rule in equity that in cases of fraud the time limited within which the action must be brought will not commence to run until the discovery of the fraud, or until the complainant was in a situation where, by the exercise of reasonable diligence, he would have discovered the fraud. Smith
v. Drake, supra; Lincoln v. Judd, 49 N.J. Eq. 387."
Referring again to the question of laches raised by counsel of the defendant, the court will not be impressed with such a *Page 452 
defense where it is used as a veil of protection against fraud. Courts do not look with favor on such a defense between parties standing in confidential relations to one another. Turnley v.Nixon, 112 N.J. Eq. 116; Oystermen's National Bank v. Edwards,Ibid. 148; Wilson v. Stevens, 105 N.J. Eq. 377. The courts will not sustain the defense of laches where the defendant has evaded his solemn duty to disclose, by fraudulently concealing from the complainant facts upon which it is entitled to relief.Turnley v. Nixon, supra; Partrick v. Groves, 115 N.J. Eq. 208.
Since Rashkes was counsel and agent for the complainant and apparently enjoyed its confidence to the utmost; since he betrayed that confidence by studiously concealing from his employer, and principal, the result of a secret profit obtained at the expense of his principal, then his unethical conduct merits the severest condemnation. Linnemann v. Summers,95 N.J. Eq. 507. Since the intermediary, or dummy purchaser, is, in effect, the alter ego of the defendant, it consequently, became, and was, the solemn duty of the defendant to disclose that relationship to his client, the complainant. It became clearly incumbent upon him to show that the purchase and sale was open, fair and profitable. But since he did not take the stand, and has failed to give a frank and direct explanation of his conduct, then his silence, in view of the accumulated evidence against him, suggests the inference of an acknowledged inability to deny the circumstances. Brown v. Bulkley, supra; Condit v.Blackwell, 22 N.J. Eq. 481; Berkeley Sulphur Springs v. Liberty,10 N.J. Mis. R. 1067.
The courts do not stop to inquire whether the agent or attorney has obtained an advantage, or whether his conduct was fraudulent or not; but if the fact is established that he has attempted to assume two distinct and opposite characters in the transactions, they will not speculate concerning the merits of the transaction, but will without hesitation pronounce it void as against public policy. Porter v. Woodruff, 36 N.J. Eq. 174; Le Gendre v.Byrnes, 44 N.J. Eq. 372. Mr. Justice Bergen clearly expressed the rule in Rogers v. Genung, 76 N.J. Eq. 306, when he said: *Page 453 
"The general rule is that he who undertakes to act for another in any matter of trust or confidence shall not in the same matter act for himself against the interest of one relying upon his integrity."
In the instant case these facts stand out clearly that the defendant opened up the negotiations with the Browns for the purchase of the premises; that the vendors' daughter was consulted by the defendant with respect to the purchase and was referred by her to her parents; that the contract between her parents and the defendant was drawn in her office; that the defendant never disclosed to Anna Brown, or her parents, that Strijesky, or any other person, was interested in the purchase; that he made it appear to her that he was solely interested in acquiring the property; that she received his check of $1,000 deposit on account of the purchase; that he received from the building and loan association a $2,000 check as a deposit on account of the purchase and that George Franklin, the person to whom this check was made payable, endorsed it; and that the same was then deposited in an account of the White Garage Company which was controlled by the defendant, who was the only person authorized to sign checks and withdraw money from that last named account; and that on this same day that the check was deposited in the White Garage Company account an amount equal to that represented by the check was withdrawn; that the deposition of Louis Strijesky shows that he had no interest whatever in the purchase and sale of the premises; that he had never seen the property until after its acquisition by the complainant; and that Altman's closing statement of the title shows the Browns sold the property for the sum of $14,200; and that the closing statement of the title of Rashkes to the complainant shows it to be $18,000, or $3,800 more than he agreed to purchase it for from the Browns. The $3,800 can unquestionably be regarded as a profit, which undoubtedly went to Rashkes, since nobody else was interested in the payments excepting the Browns, Rashkes, and Strijesky. Strijesky's death bed testimony makes it clear that he received no part of the moneys, and Rashkes, in the face of the allegations made against him in the bill of complaint, and the testimony *Page 454 
which was submitted at the hearing, made no explanation at the hearing. No explanation of the part the Franklins had in the sale or purchase appears; and their attitude, so far as the evidence now stands, remains within the realms of mystery.
In Gordon v. Kaplan, 99 N.J. Eq. 390, Judge White said:
"The learned Vice-Chancellor who heard the case thought the facts exceedingly suspicious, but not sufficiently so to overcome the absolute regularity of the checks, receipts, deposit entries,c., which accompanied the alleged pretended resale. We are not particularly impressed by this absolute regularity. If Kaplan and Lieberfeld were `scalping' this sale, all this absolute regularity occurred while they were going through the motions intended to look like, and, in fact (except as to their secret fraud), constituting a real transaction. Naturally they did the things necessary to produce the proper stub entries, deposit entries, checks and receipts usually accompanying such a transaction. They would have been very foolish not to have done so. In order to accomplish the intended fraud (if that is what they were guilty of) they put through what was in form a real transaction, and, consequently, it, of course, appears to have been put through in the usual way. They could not, in fact, accomplish this particular kind of fraud without doing the things which they did do, any more than they could have put through a real transaction which was not fraudulent, in this way, without doing those same things. Naturally, therefore, the presence in regular form and sequence of these necessary links in the transaction has little evidential value, one way or the other, on the question of whether the transaction was or was not fraudulent in the manner here claimed. The absence of some of these links might be quite different."
In Nagle v. McCoy, 94 N.J. Eq. 790, the court said:
"The suit was to recover back the sum of $500 claimed to have been obtained by fraud, in that defendants, after being employed by complainant to obtain a dwelling house property for him, obtained control of it themselves and by misrepresentation induced complainant to contract for it with one ostensibly the owner, but really the secret agent of defendants, *Page 455 
at a price $500 more than they had agreed to pay the real owner.
"The details of the evidence exhibit a process of circumlocution which is not uncommon in this class of cases and need not be reviewed here in extenso. It is enough to say that we concur with the learned vice-chancellor in his findings that the defendant McCoy, when employed by complainant to sell his house and buy another one in a different place undertook to do so, and finding a house which he thought would suit, negotiated for it at $7,250; showed it to complainant as priced at $7,750; used $750 which complainant had paid on account to help vest the title in a corporation controlled by the defendants and conveniently available for that purpose, and induced complainant to contract for it at the higher price under the false representation he was dealing with a bona fide owner. In all this Werbel assisted as an alter ego of McCoy.
"Such a case is plainly within the rulings in Porter v.Woodruff, 36 N.J. Eq. 174; Rogers v. Genung, 76 N.J. Law 306, and Harrop v. Cole, 85 N.J. Law 32; 86 N.J. Law 250. It is urged that complainant paid the extra $500 voluntarily after becoming aware of the facts; but he did not learn that the company that made the deed and took his money was identified with defendants until after he had paid; and this was the essence of knowledge of the real case.
"The decree will be affirmed."
The defendant occupied a position of trust and confidence, and he had the burden, in this case, of proving the regularity of his transaction. He offered no proof to sustain him. Under the circumstances, there is no alternative for the court but to incline favorably towards the complainant and most strongly against the defendant, the attorney who, while acting as such, had business relations with his client on his own account.Dwyer v. Anderson, supra; Perkins v. Deal Beach Realty Co.,92 N.J. Eq. 526; affirmed, sub nom. Perkins v. Robinson, Ibid.692.
The facts as presented show a clear violation of the duty of undivided loyalty due from the attorney to his client. Loyalty to his client should have prompted him to acquire the property at the lowest price, and to give his client the benefit of *Page 456 
his efforts. An unswerving adherence to duty should have motivated him to at least disclose to the complainant the circumstances under which Strijesky came into the picture. Undoubtedly, no person could, at the hearing, more exactly and truthfully state those circumstances. The defendant cannot justify his act with the contention that the property was worth all the complainant paid for it. Such a defense is no answer to a suit for divided loyalty. Salsbury v. Ware (Ill.),56 N.E. Rep. 149; Calmon v. Sarraille (Cal.), 76 Pac. Rep. 486;Clinkscales v. Clark (Mo.), 118 S.W. Rep. 1182; Thomas v.Newcomb (Ariz.), 221 Pac. Rep. 226.
If the defendant had not appeared in the transaction of purchase, the committee representing the complainant would, it may be assumed, have been confronted with the terms or advantages that were presented to Rashkes by Miss Brown when he called upon her to ascertain the conditions under which the property could be purchased. The assertion cannot be gainsaid that Rashkes' divided loyalty cost the complainant $3,800. Tuers v. Tuers (Ct. ofApp., N.Y., 1885), 2 N.E. Rep. 922; Palmer v. Pirson (Sup.Ct., N.Y., 1893), 24 N.Y.S. 333; affirmed, 39 N.E. Rep. 494;Myers v. Adler (Ct. of App., Mo., 1915), 176 S.W. Rep. 538;Myers v. Linebarger (Sup. Ct., Ark., 1918),203 S.W. Rep. 580; Thomas v. Newcomb, supra.
The liquidator's right to recover for the shareholders and creditors, and complainant, is sustained by the evidence.Citizens Loan Association v. Lyon, supra; Williams v. McKay,supra; French v. Armstrong, 79 N.J. Eq. 283; Purchase v.Atlantic Safe Deposit and Trust Co., 81 N.J. Eq. 344; affirmed,83 N.J. Eq. 353.
The complainant is entitled to a decree against the defendant for the profit of $3,800 and for the sum of $123, fees shown by his closing statement to have been charged against the complainant, together with interest on these sums from March 9th, 1926, the date of the transfer of title. I shall advise an order to this effect. *Page 457